UNITED STATES of America, Appellee,

v.

Charles Allan BAMMAN, Appellant.

UNITED STATES of America, Appellee,

v.

Claude Howard HARLOW, Appellee.

Nos. 83–5280, 83–5281.

United States Court of Appeals,
Fourth Circuit.

Argued April 6, 1984.

Decided June 18, 1984.

Stanley K. Joynes, III, Richmond, Va. (Rilee, Cantor, Arkema & Edmonds, Richmond, Va., on brief) and John B. Mann, Richmond, Va. (Levit & Mann, Richmond, Va., on brief), for appellants.

James T. Lloyd, Jr., Student Asst. to the U.S. Atty. (Elsie L. Munsell, U.S. Atty., Gregory Welsh, Asst. U.S. Atty., Richmond, Va., on brief), for appellee.

Before WINTER, Chief Judge, and HALL and PHILLIPS, Circuit Judges.

K.K. HALL, Circuit Judge:

Charles A. Bamman and Claude H. Harlow appeal from their convictions by a jury of counterfeiting obligations of the United States and aiding and abetting counterfeiting in violation of 18 U.S.C. §§ 471 and 2. We affirm.

### I.

In mid-August, 1982, the United States Secret Service and the Department of the Treasury began an investigation of the printing and passing of counterfeit $100 bills in the Richmond, Virginia, area. This investigation led to the questioning of several inmates at the Virginia State Penitentiary, including Robert Layne and Robert L. Grooms, Jr.

Layne informed the government investigators that he had seen Charles Bamman, a fellow inmate, printing an image of a bill on the prison press in July, 1982. Layne also reported seeing Bamman tearing up sheets of counterfeit bills and mixing green ink[1] in the print shop. A search of the prison print shop revealed, on multilith number two, an off-set rubber printing blanket bearing the face impressions of three counterfeit $100 bills. Bamman was the only operator assigned to multilith number two.

Another inmate, Claude Harlow, ran the print shop darkroom. Harlow reviewed jobs coming into the print shop for photographing and was in charge of plate making. According to Layne, in July, 1982, he saw Harlow place counterfeit plates in a drawer in the print shop darkroom. Layne said that on two occasions, Harlow asked him to delay taking the trash out until he could place some items in the trash and that the trash was subsequently taken directly to the garbage truck, thereby preventing any search of its contents.

Robert Grooms admitted to the government investigators that he had been personally involved in the counterfeiting operation, and stated that in early August, 1982, Bamman had informed him that he was printing $100 bills. Grooms said that he subsequently met with Bamman and Harlow to discuss the printing of the bills and the splitting of the proceeds. He also stated that he was present when Harlow soaked the counterfeit bills in green dye and when the bills were distributed. Upon Grooms' information, the Secret Service confiscated $19,000 in counterfeit $100 bills hidden in the penitentiary.

On August 23, 1982, Virginia State Penitentiary officials concluded that Bamman and Harlow posed a security threat to the prison due to their counterfeiting activities. Accordingly, to safeguard the institution from "being flooded with counterfeit money" and to keep the conspirators from having ready access to one another, the prison officials placed both defendants in administrative segregation. The state authorities subsequently transferred Bamman and Harlow to the Powhatan Correctional Center, in Powhatan, Virginia, on November 19, 1982.

Federal authorities indicted Bamman, Harlow, and three codefendants on June 21, 1983, for counterfeiting and aiding and abetting in the counterfeiting of obligations of the United States. On July 7, 1983, pursuant to a writ of habeas corpus *ad prosequendum*, the United States Marshal's Service took custody of defendants

---

1. All inks for approved prison print jobs were premixed and not mixed by any workers.

from the Powhatan Correctional Center and placed them in cells in the United States Courthouse in Richmond, Virginia. Defendants were arraigned—but not tried—and returned to the custody of the Correctional Center that same day. Bamman and Harlow subsequently filed motions to dismiss their indictments on the ground that the prosecution had violated Section 2, Article IV(e) of the Interstate Agreement on Detainers Act[2] (the "IADA") by failing to try them before returning them to state prison. Their motions were denied.

Pursuant to a second writ of habeas corpus *ad prosequendum,* the United States took custody of the defendants on September 19, 1983, for their trial before the district court. At trial, defendants attempted to impeach the testimony of Layne with the testimony of a staff psychologist at the Virginia State Penitentiary. The psychologist had had little contact with Layne and sought to base his opinion that Layne was inclined to say or do things to ingratiate himself to others on progress reports covering the period from 1976 to April, 1982. The district court refused to allow this testimony due to its secondhand, speculative nature.

Bamman and Harlow were found guilty as charged and now appeal their convictions.

## II.

Appellants' central contention on appeal is that the district judge erred in denying their motions to dismiss on the ground that the government had violated Article IV(e) of the IADA. We disagree.

■ Under Article IV(e) of the IADA, when a prisoner is taken from state custody into federal custody pursuant to a detainer

[i]f trial is not had on any indictment, information, or complaint contemplated ... prior to the prisoner's being returned to the original place of imprisonment ... such indictment, information, or com-

plaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

18 U.S.C., App. § 2, Art. IV(e) (1982). Both the United States and the Commonwealth of Virginia are parties to the IADA.

Appellants were taken from the custody of Virginia for arraignment pursuant to a writ of habeas corpus *ad prosequendum.* In *United States v. Mauro,* 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978), the Supreme Court specifically concluded that "a writ of habeas corpus *ad prosequendum* is not a detainer for purposes of the [IADA]." *Id.* at 361, 98 S.Ct. at 1847–48. Because the United States did not issue a detainer in this case there was no violation of the IADA.

■ Appellants nevertheless contend that their transfer from the general prison body to administrative segregation at the Virginia State Penitentiary and their subsequent transfer from the penitentiary to the Powhatan Correctional Center was a direct consequence of the federal investigation and that the state authorities' knowledge of the investigation provided them with sufficient notice to make the government's actions equivalent to the filing of a detainer. Contrary to this contention, we hold that a detainer requires a specific volitional act on the part of the government.

The legislative history to the IADA states that "[a] detainer is a *notification filed* with the institution in which a prisoner is serving a sentence advising that he is wanted to face pending criminal charges in another jurisdiction." H.R.Rep.. No. 91–1018, S.Rep. No. 91–1356, 91st Cong., 2d Sess. 3, *reprinted in* 1970 *U.S.Code Cong. & Ad.News* 4864, 4865 (emphasis added). The district court found that appellants were transferred because their counterfeiting activities posed a security threat to the prison. The fact that the state authorities came to have knowledge of the federal counterfeiting investigation does not fulfill the "notification filed" requirement for a detainer. *See United States v. Reed,* 620

2. 18 U.S.C., App., Interstate Agreement on Detainers, § 2, Art. IV(e) (1982).

F.2d 709 (9th Cir.1980) (defendant who was removed from state prison to be arraigned in federal court, then returned to state authorities, could not prove violation of the IADA because "the federal government never lodged a detainer"). Thus, because no notification was filed in this case, appellants' contention that there was a "functional equivalent of a detainer" must fail.

### III.

Appellants also contend that the district judge erred in refusing to admit the testimony of the staff psychologist to impeach government witness Layne. We disagree.

The admission of expert testimony by psychologists is left to the sound discretion of the trial judge. *United States v. Riggleman*, 411 F.2d 1190, 1191 (4th Cir.1969). In the instant case, the trial judge excluded the testimony because the psychologist's opinion was speculative and secondhand. *See, e.g., United States v. Bohle*, 445 F.2d 54, 69 (7th Cir.1971) (medical expert may not testify regarding his opinion on defendant's sanity based on information obtained out of court from a third person). Thus, the trial judge acted within his discretion in not admitting the testimony of the staff psychologist.

### IV.

After a careful review of the record, we have determined that appellants' additional challenges to the judgment below are also without merit. We conclude that there was sufficient evidence to support the verdicts of guilt beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Sherman*, 421 F.2d 198, 199–200 (4th Cir.), *cert. denied*, 398 U.S. 914, 90 S.Ct. 1717, 26 L.Ed.2d 78 (1970).

### V.

Accordingly, for the foregoing reasons, the convictions are affirmed.

AFFIRMED.