UNITED STATES of America,
Plaintiff–Appellee,

v.

Larry WEAVER and Mark Schmanke,
Defendants–Appellants.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Everett DECKER, Jerald Jessup and Michael Bailey, Defendants–Appellants.

Nos. 88–1179, 88–1437, 88–1572,
88–1579 and 88–1595.

United States Court of Appeals,
Seventh Circuit.

Argued May 15 and June 12, 1989.

Decided Aug. 8, 1989.

As Amended Aug. 11 and Sept. 8, 1989.

James G. Richmond, U.S. Atty., Hammond, Ind., Richard A. Cook, Asst. U.S. Atty., South Bend, Ind., for U.S.

James M. Miller, Mirkin, Tuesley & Miller, South Bend, Ind., for Larry Weaver.

Christopher C. Myers, Myers & Wagoner, Fort Wayne, Ind., for Mark Schmanke.

Paul J. Newman, South Bend, Ind., for Everett Decker.

Bradley E. Prendergast, Hall & Kurz, Chicago, Ill., for Jerald Jessup.

Robert C. Rosenfeld, South Bend, Ind., for Michael Bailey.

Before BAUER, Chief Judge, CUMMINGS and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

This case involves the appeals of five defendants found guilty by a jury of participating in various parts of a widespread scheme to alter and cash postal money orders. Each of the defendants raise different objections to their convictions. We affirm.

## I.

The defendants in these consolidated cases are five of twenty-two persons indicted in connection with a conspiracy to alter and cash postal money orders.[1] The conspiracy was centered in the Indiana State Penitentiary located at Michigan City. Some inmates at the prison arranged with various individuals outside the prison to have small denomination postal money orders, usually in the $1–3 range, smuggled into the prison. Inside the prison, the money orders were altered to much larger denominations, usually $100–300, and then smuggled back outside the prison where

---

1. Other panels of this court have already heard, and for the most part rejected, the appeals of some of those twenty-two defendants. *See United States v. Gaddis,* 877 F.2d 605 (7th Cir.1989); *United States v. Field,* 875 F.2d 130 (7th Cir. 1989).

they were cashed. Some of the individuals who cashed the money orders were aware of the scheme while others participated on the assumption that the money orders were legitimate. The proceeds from the altered money orders were either used to pay inmate debts outside the prison or made their way back into the prison, in the form of drugs or cash, to be divided among the participating inmates. At this point, the cases of the five defendants diverge and, thus, we will treat them individually.

## II.

### A. Michael Bailey

Bailey was an inmate at the Michigan City prison. He was charged with one count of conspiracy (Count 1), a count common to all of the defendants, in violation of 18 U.S.C. § 371, one count of possession of false and altered money orders (Count 159), in violation of 18 U.S.C. § 1002, two counts of aiding and abetting transmission and presentment of altered money orders (Counts 127 and 134), in violation of 18 U.S.C. §§ 2 and 500, and seventeen counts of aiding and abetting mail fraud (Counts 126, 128–33, 135–39, 154, 169, 174–75, and 178), in violation of 18 U.S.C. §§ 2 and 1341. The jury found him guilty on all of these counts and the court sentenced him to a total of 25 years imprisonment, the sentence to run consecutive to the Indiana state sentence he is currently serving.

■ Bailey's first claim on appeal is that the charges against him should have been dismissed because the government violated the Interstate Agreement on Detainers (the "Agreement"). The Agreement, to which Indiana and the United States are both signatories, provides a comprehensive set of procedures to deal with the disruptions and uncertainties that arise when a "detainer[ ] based on untried indictments, informations, or complaints" is lodged against a prisoner already incarcerated in another jurisdiction. *United States v. Mauro*, 436 U.S. 340, 351, 98 S.Ct. 1834, 1842, 56 L.Ed.2d 329 (1978). Bailey apparently claims that the charges against him should have been dismissed because the

government violated two provisions of the Agreement.

First, Bailey claims that the government failed to abide by Article IV(c) of the Agreement, which requires that proceedings made possible by the agreement take place within 120 days of the arrival of the prisoner in the charging state. Bailey was arraigned on September 14, 1987, and was not tried until January 19, 1988, 127 days later. Second, Bailey alleges that the government violated Article III(c) of the Agreement, which mandates that the warden promptly notify the prisoner of the source and contents of the detainer and also advise the prisoner of his rights under the Agreement.

A necessary prerequisite to the operation of the Agreement is that a detainer has actually been lodged by the charging state with the jurisdiction in which the prisoner is held. *Mauro*, 436 U.S. at 343, 98 S.Ct. at 1838; *United States v. Bamman*, 737 F.2d 413, 415 (4th Cir.1984), *cert. denied*, 469 U.S. 1110, 105 S.Ct. 789, 83 L.Ed.2d 783 (1985). The Agreement itself does not define a detainer so courts have adopted the definition found in the House and Senate reports accompanying the Agreement. *See United States v. Trammel*, 813 F.2d 946, 948 (7th Cir.1987); *Bamman*, 737 F.2d at 415. According to those reports, a detainer is "a notification filed with the institution in which a prisoner is serving a sentence advising that he is wanted to face pending criminal charges in another jurisdiction." H.R.Rep. No. 1018, 91st Cong., 2d. Sess. 2 (1970); S.Rep. No. 91–1356, 91st Cong., 2d. Sess. 2, *reprinted in*, 1970 U.S.Code Cong. & Admin.News 4864, 4865. In this case, the district court held that the provisions of the Agreement were not applicable because no detainer was actually filed. We agree.

Bailey supports his claim that a detainer was filed against him principally with his own testimony. He testified that in September 1987, he was taken out of the general prison population by Indiana prison personnel and placed in administrative segregation for approximately 23 days. Bailey asserts that when he inquired why he was placed in segregation, he was told by

prison officials that it was at the behest of postal inspectors. Nevertheless, Bailey also testified that the only documentation he ever saw supporting his segregation was a pink "101" slip, the slip used to document a violation of internal prison rules. Finally, Bailey points out that United States Postal Inspector Egan, the official who coordinated the mail order investigation at the prison, testified that he has the power to arrest and detain. From this evidence, Bailey claims that the government lodged a detainer against him prior to his placement in administrative segregation.

■ We agree with the district court that this evidence, without more, was insufficient to show that a detainer was filed. To show that a detainer has been "filed" there must be, at a minimum, proof that authorities from the charging jurisdiction notified the authorities where the prisoner is held that the prisoner is wanted to face charges.[2] There is no proof in this case of any such communication. Bailey could identify neither the postal inspector who supposedly gave the order to have him placed in administrative segregation nor the Indiana prison official with whom he spoke. Also, while Inspector Egan admitted that he had the power to arrest and detain, there was no indication that he actually used that power in this case. Finally, the only document Bailey received was consistent with the government's position that Bailey was placed in segregation as a result of internal prison discipline.[3] In sum, Bailey has failed to show that his administrative segregation followed from a detainer, and thus he was not entitled to the protection of the Interstate Agreement on Detainers.

■ Bailey's second claim on appeal is that there was insufficient evidence to support his conviction on the charge of possessing altered money orders. Six money orders were found by prison personnel in the course of a search of Bailey's cell. At trial, Correctional Officer John Pegg, the officer who found the money orders in Bailey's cell, testified that the money orders were stained with purple blotches when he found them. Correctional Officer Charles Penfold, however, testified that the blotches were not originally on the money orders but were the product of ninhydrian, a chemical used to detect latent fingerprints. Penfold's testimony was corroborated by Postal Inspector Robert Thompson, who was responsible for sending the money orders to a laboratory for testing. Bailey claims that this discrepancy in testimony precluded his conviction on the possession charge.

A defendant who claims insufficient evidence exists to support his or her conviction carries a heavy burden. *United States v. Muskovsky*, 863 F.2d 1319, 1322 (7th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 1345, 103 L.Ed.2d 813 (1989). To be successful, the defendant must show that, viewing the evidence in the light most favorable to the government, no rational juror could have found all the elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Field,* 875 F.2d 130, 137 (7th Cir.1989). Bailey has not met his burden in this case.

---

**2.** Some courts have required substantially more than simple notification from one jurisdiction to another. For example, in *State v. Bronkema,* 109 Idaho 211, 214, 706 P.2d 100, 103 (Ct.App. 1985), the court held that only *written* notification would suffice to constitute a detainer. In *United States v. Reed,* 620 F.2d 709, 711 (9th Cir.), *cert. denied,* 449 U.S. 880, 101 S.Ct. 229, 66 L.Ed.2d 104 (1980), state officials learned that the prisoner was wanted to face federal charges and marked his records with the notation "Hold for U.S. Marshals." The court held that this did not constitute a detainer since the notation had been made by a state official without the di-

rection of a federal official or agent. We need not decide the exact contours of the notification requirement in this case because Bailey has failed to show that any communication between federal and state officials preceded his administrative segregation.

**3.** Bailey was eventually brought into federal custody pursuant to a writ of habeas corpus *ad prosequendum.* Such a writ does not constitute a detainer within the meaning of the Agreement. *Mauro,* 436 U.S. at 361, 98 S.Ct. at 1847.

Taken in the light most favorable to the government, a rational juror could have found that the defendant had committed all the elements of the crime beyond a reasonable doubt. All of the witnesses agreed that altered money orders were found in Bailey's cell. They also agreed that the denominations of the money orders produced at trial matched the denominations of those found in the cell. The only discrepancy was over the presence of the purple blotches. We believe that a rational juror could find that Officer Pegg was mistaken about the presence of the purple blotches and yet was correct in the balance of his testimony. Officer Pegg's testimony as to the blotches can be best characterized as equivocal. At times he appeared to be certain that the blotches were present when he discovered the money orders in Bailey's cell. On the other hand, when pressed as to whether the blotches were present, Pegg responded that "I can't really say for sure but all I can say it was back in 1983." Even if Pegg's testimony had been less equivocal, we do not believe that the discrepancy was significant enough to warrant a finding that insufficient evidence supported Bailey's conviction for possession of altered money orders.

## B. Everett Decker

Decker, like Bailey, was an inmate at the Michigan City Prison. In addition to the common conspiracy count, Decker was charged with one count of aiding and abetting transmission and presentment of an altered money order (Count 87), in violation of 18 U.S.C. §§ 2 and 500, and six counts of aiding and abetting mail fraud (Counts 61, 86, and 88–91), in violation of 18 U.S.C. §§ 2 and 1341. The jury found Decker guilty on all of these counts and the court sentenced him to a total of 17 years' imprisonment. On appeal, Decker joined in Bailey's claim that the charges against him should have been dismissed because the government violated the Interstate Agreement on Detainers. For the reasons stated above, we reject that claim.

■ Decker also argues that there was insufficient evidence to convict him on the charge of aiding and abetting transmission and presentment of an altered money order. This count was premised on the presentment of an altered money order by Roger Minch, a private citizen living in upstate New York. Minch testified that he corresponded with Decker in 1982. In the course of that correspondence, Decker asked Minch to assist a fellow inmate, Perry Lockridge, by cashing money orders Lockridge earned through sales of leather goods and by sending the proceeds to addresses that would be furnished. Shortly thereafter, Minch began to receive altered money orders, including government exhibit 310A, the $600 money order that is the subject of this count. The money order was sent by a woman named Helen Grogan, who was also the author of an enclosed letter. Minch was instructed to cash the money order, which he did, and to send the proceeds to William Veetch, a resident of Indiana, which he failed to do.

In a letter that followed the arrival of the money order, Decker questioned Minch as to why the proceeds of the $600 money order had not been sent to Veetch. Decker explained to Minch that the $600 was owed to him by Lockridge and urged that Minch follow through with the arrangement. Also, Veetch testified that Decker told him that money would be sent to him by Minch.

Decker admits that government exhibit 310A was altered and cashed but claims that he has no connection to it or Helen Grogan. As Decker points out, neither the money order nor the accompanying letter are in his handwriting and his fingerprints were not found on the money order. Yet it is clear from Decker's correspondence with Minch and Veetch that Decker was aware that the $600 money order was sent to Minch, that the recipient of the proceeds would be William Veetch, and that Minch failed to send the cash on to Veetch.

18 U.S.C. § 500 prohibits any person from transmitting, presenting or causing to be transmitted or presented any money order which has been materially altered if that person has an intent to defraud. Decker was charged with aiding and abetting a violation of that provision pursuant

to 18 U.S.C. § 2.[4] Decker has admitted that the money order was altered and that it was transmitted and subsequently presented at a bank. Also, Decker does not deny that the person who transmitted the money order, whether it was Helen Grogan or some other person, acted with an intent to defraud. Thus, the only question is whether the government adduced sufficient evidence to show that Decker aided and abetted this violation of § 500.

In the words of Learned Hand, a person aids or abets a crime when he or she "in some sort associate[s] himself with the venture, ... participate[s] in it as in something that he [or she] wishes to bring about, [and] ... seek[s] by his [or her] action to make it succeed." *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir.1938). Under this standard, the government produced sufficient evidence from which a rational juror could find that Decker aided and abetted the § 500 violation. Decker's correspondence with Minch and Veech clearly showed that he was associated with this venture. His admission to Minch that he would benefit from presentment of the money order gave him a vested interest in the venture and his urging of Minch was a step in accomplishing its fruition. In sum, while there was little evidence directly tying Decker to government exhibit 310A, we believe there was sufficient evidence to show that Decker at least aided and abetted its transmission and presentment.

### C. Jerald Jessup

Jessup, like Decker and Bailey, was an inmate at the Michigan City prison. He was charged with the common conspiracy count, 33 counts of mail fraud (Counts 9– 14, 54, 57–58, 61, 63–64, 66, 70–73, 75–77, 112–13, 118–19, 121, 140–42, 153, 156, 161– 62, and 171), in violation of 18 U.S.C. § 1341, and 11 counts of transmission and presentment of altered money orders (Counts 56, 59–60, 62, 67, 69, 74, 116, 122, and 163–64), in violation of 18 U.S.C. § 500. The jury found Jessup guilty on all of these counts, except count 66, and the court sentenced him to a total of 65 years' imprisonment and fined him $5,000.

■ Approximately one week prior to the start of his trial, Jessup gave notice to the court and the government that he intended to call an expert psychiatric witness. Jessup expected that the expert would support his defense that his years of imprisonment had so destroyed his moral character that he could not understand the wrongfulness of his acts and thus could not form a specific intent to commit a crime.[5] At the time he filed his notice Jessup had not yet located an expert who would support his theory of defense.

Federal Rule of Criminal Procedure 12.-2(b) requires that a defendant notify the government and the court if he or she intends to utilize expert testimony.[6] The notice must be given during the time prescribed for the filing of pre-trial motions but may be given later if the court finds cause for the delay. Because Jessup's notice was filed after the time provided for pre-trial motions, the government moved to strike the notice as untimely. Jessup recognized that the time for filing had passed but argued that the difficulty he had in meeting with his attorney constituted cause

---

4. 18 U.S.C. § 2(a) states that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

5. The crimes for which Jessup was charged are all specific intent offenses. *See United States v. Bush,* 522 F.2d 641, 648 (7th Cir.1975), *cert. denied,* 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976) (mail fraud); *United States v. Broadus,* 664 F.Supp. 592, 599 (D.D.C.1987) (presentment and transmission of altered money order).

6. Rule 12.2(b) states, in its entirety, that:

If a defendant intends to introduce expert testimony relating to mental disease or defect or any other mental condition of the defendant bearing upon the issue of guilt, the defendant shall, within the time provided for the filing of pretrial motions or at such later time as the court may direct, notify the attorney for the government in writing of such intention and file a copy of such notice with the clerk. The court may for cause shown allow late filing of the notice or grant additional time to the parties to prepare for trial or make such other order as may be appropriate.

for the delay. The district court disagreed and struck Jessup's notice.

On appeal, Jessup argues that the district court abused its discretion in striking the notice. Alternatively, Jessup argues that the failure to timely file the notice resulted from such inadequate pre-trial investigation on the part of his attorney that he was denied his sixth amendment right to the effective assistance of counsel. We reject both claims.

Whether a defendant has shown cause for failure to timely file a notice is a matter of discretion for the district court and we will upset the court's decision only if that discretion was abused. *United States v. Buchbinder*, 796 F.2d 910, 914 (7th Cir. 1986); *United States v. Duggan*, 743 F.2d 59, 80 (2d Cir.1984). We find no abuse of discretion in the district court's decision to strike Jessup's notice. The notice was given very late in the proceedings, just one week prior to trial, and, as Jessup recognizes, would have required a delay in the trial in order to give the government time to meet the expert testimony. It is just such a delay that the notice provision of Rule 12.2(b) is intended to obviate. *See* Notes of Advisory Committee on Rules, Fed.R.Crim.P. 12.2. Moreover, late notice is appropriate only where the defendant can show that there is some merit to the defense which will be supported by the expert testimony. *United States v. Cox*, 826 F.2d 1518, 1521 (6th Cir.1987), *cert. denied*, ── U.S. ──, 108 S.Ct. 756, 98 L.Ed.2d 768 (1988) ("cause" consists, in part, of showing some merit in the position to be advanced); *Duggan*, 743 F.2d at 80 (same). In this case, where the defendant had not even found an expert who would support his proposed defense, the district court had to assume that there was no merit to the defense and thus acted well within its discretion in striking Jessup's notice.

Jessup argues that if it was not an abuse of discretion to strike the notice, then his counsel's failure to timely file the notice means he was deprived of his sixth amendment right to the effective assistance of counsel. To succeed on a claim of constitutionally ineffective assistance of counsel, a defendant must show that (1) his or her counsel's conduct fell below that of a reasonably competent attorney under the circumstances and (2) there is a reasonable probability that, but for counsel's unprofessional conduct, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). It is not necessary to determine in every case whether counsel's conduct was deficient; if the result would have been the same regardless of counsel's conduct, then there has been no denial of the sixth amendment right to effective assistance of counsel. *Id.* at 697, 104 S.Ct. at 2069.

In this case, Jessup has failed to show that there is any probability, much less a reasonable probability, that the result of his case would have been different if timely notice had been filed. Initially, it is unclear whether Jessup would have ever been able to produce an expert who would have supported his defense. More importantly, to the extent his defense was viable, Jessup succeeded in presenting it to the jury through his own testimony and his counsel's closing argument to the jury. *See United States v. Paradis*, 802 F.2d 553, 564 (1st Cir.1986) (no prejudice from counsel's failure to secure expert testimony, because of late notice, where jury was made aware of the issue through the testimony of other witnesses). Thus, we do not believe that defense counsel's failure to file timely notice pursuant to Rule 12.2(b) amounted to constitutionally ineffective assistance of counsel.

### D. Mark Schmanke

Schmanke was another inmate at the Michigan City prison. He was charged with the conspiracy count, nine counts of aiding and abetting mail fraud (Counts 37–40, 65, 145, 149–51), in violation of 18 U.S.C. §§ 2 and 1341, seven counts of aiding and abetting transmission and presentment of altered money orders (Counts 32–35, 144, 147–48), in violation of 18 U.S.C. §§ 2 and 500, and one count of aiding and abetting wire fraud (Count 36), in violation of 18

U.S.C. §§ 2 and 1343. The jury found Schmanke guilty on all of these counts and the court sentenced him to a term of 20 years in prison.

■ On appeal, Schmanke raises a raft of claims relating to the conduct of both the prosecution and his trial counsel. Some of the claims are based on a misapprehension of the conduct of the relevant parties before and during the trial. For example, Schmanke claims that he was denied effective assistance of counsel because his trial counsel failed to cross-examine a government witness on the question of whether the witness was receiving lenient treatment from the government in exchange for the witness' testimony. It is clear from the transcript, however, that defense counsel did vigorously cross-examine the witness on that subject. We will not discuss these claims since they are clearly meritless. We wish to emphasize that we take claims of prosecutorial misconduct and ineffective assistance of counsel very seriously and will look askance when appellate counsel raise these kinds of claims without any support in the record.

### 1. Ineffective Assistance of Counsel

Not including those claims which are clearly meritless, Schmanke asserts that six different errors of his trial counsel denied him his sixth amendment right to the effective assistance of counsel: (1) failure to record and enforce the results of plea negotiations; (2) failure to request an investigator in a timely manner; (3) failure to impeach witnesses who changed their testimony; (4) failure to call witnesses at his detention hearing; (5) failure to compel witnesses to impeach a government witness; and (6) failure to request a psychological examination. We are not convinced that any of these failures were the result of unprofessional conduct by Schmanke's trial counsel. Moreover, even if we were to assume that counsel's performance was deficient in one or more of these respects, Schmanke has not shown that he was prejudiced in any way.

■ a. Schmanke claims that that his trial counsel was ineffective because he failed to record and enforce the results of plea bargain negotiations. Schmanke alleges that an "agreement to agree" was reached in which he would plead guilty to three counts of mail fraud in exchange for providing the government with a complete account of the mail order scheme and any other illegal activity of which he was aware. According to Schmanke, the government later reneged on the agreement, asserting that Schmanke had not been truthful in giving information to the government. Schmanke believes his counsel's conduct was deficient because he failed to enforce the agreement and failed to have the negotiations recorded, thus making it virtually impossible to have the agreement enforced even if that had been attempted.

The government contends that the conduct of Schmanke's counsel was not deficient because there was no agreement which could have been enforced. According to the government, Schmanke's complete and accurate rendition of the mail order scheme and other illegal conduct was a prerequisite to the plea agreement. Because the government found Schmanke's information to be erroneous and incomplete, the plea agreement was never consummated.

We do not believe that trial counsel's conduct in failing to enforce the "agreement" was deficient. Schmanke's defense counsel shared the government's view that there never was a firm plea agreement. Counsel told the trial court that "in order to determine whether it was going to be an agreement [Schmanke] would be debriefed. The government would then make a decision as to what they felt to be the credibility of Mr. Schmanke." Given that there was no plea bargain to enforce, it was obviously within the permissible range of conduct for counsel not to attempt to enforce the plea bargain. Also, since the plea negotiations themselves generally cannot be enforced, it is not unreasonable for defense counsel not to have them recorded.

Schmanke cites *United States v. Verrusio*, 803 F.2d 885 (7th Cir.1986) and *United States v. Calabrese*, 645 F.2d 1379 (10th

Cir.), *cert. denied,* 451 U.S. 1018, 101 S.Ct. 3008, 69 L.Ed.2d 390 (1981), for the proposition that even an agreement to agree is enforceable against the government. Neither of those cases stand for that proposition. In both cases a plea agreement had actually been reached, an oral agreement in *Verrusio,* 803 F.2d at 886 n. 1, and a written agreement in *Calabrese,* 645 F.2d at 1389, and the government subsequently backed out. In this case, no agreement was ever finalized and thus there was nothing from which the government could back out. In sum, trial counsel's conduct relating to the plea negotiations was not deficient.

 b. Schmanke next argues that his trial counsel was ineffective because he failed to adequately prepare for trial. Specifically, Schmanke argues that his counsel's failure to request the aid of an investigator until one week before trial stymied the defense's ability to: seek evidence to corroborate his story; interview unindicted co-conspirators still residing at the Michigan City prison; and investigate facts which could have undermined the credibility of government witnesses. Also, Schmanke claims that trial counsel's misinterpretation of a court order resulted in counsel's failing to review with Schmanke documents produced by the government.

 Effective representation of a criminal defendant requires pretrial preparation and investigation. *Crisp v. Duckworth,* 743 F.2d 580, 583 (7th Cir.1984), *cert. denied,* 469 U.S. 1226, 105 S.Ct. 1221, 84 L.Ed.2d 361 (1985). In most cases that preparation and investigation will include consultation between attorney and client, interviews with important witnesses for the defense and prosecution, and investigation of potentially fruitful defenses. *United States v. Tucker,* 716 F.2d 576, 581 (9th Cir.1983). If defense counsel is unable to personally complete these tasks, then counsel must seek the aid of others, including experts and investigators, to assist in the preparation and investigation. Of course, these duties are subject to the reasonable judgment of defense counsel in light of the facts of any particular case. It may be the

case that defense counsel believes a particular avenue of investigation will be pointless. In that circumstance, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment." *Strickland v. Washington,* 466 U.S. 668, 691, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984). We give effect to that deference by employing "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065.

On the record before us, Schmanke has not overcome the strong presumption of reasonableness accorded his counsel's actions. It is impossible for us to determine whether counsel's pretrial investigation was deficient: we do not know how many times counsel and defendant met before trial, when in relation to the start of trial those meetings took place, and whether information was provided to counsel which would have benefitted from further investigation. Similarly, we have no way of knowing why counsel waited until the eve of trial to petition the court for permission to hire an investigator. Maybe it was because he felt an investigator would be unable to find anything of relevance, maybe because the defendant waited until the eve of trial to provide counsel with information which would have made an investigator useful, or maybe because counsel was indeed negligent in seeking permission from the court. On the record before us we simply cannot answer these questions. Also, Schmanke has not told us what would have been found had he had a greater opportunity to discuss and analyze with his counsel the documents produced by the government. Thus, defendant has not rebutted the presumption of reasonableness and we are unable to say that counsel's pretrial conduct was constitutionally deficient.

 Even if we could find, or an evidentiary hearing could show, that counsel's pretrial conduct was unreasonable, defendant has not shown any prejudice. Schmanke asserts that if investigators had

been employed earlier, witnesses might have been found who could support his duress defense and evidence to undermine the credibility of government witnesses could have been uncovered. This is pure speculation. Moreover, such evidence would have been cumulative to evidence Schmanke introduced at trial. Under those circumstances, we find that even if counsel's conduct was unreasonable, Schmanke did not suffer prejudice as a result.

 c. Next, Schmanke argues that his counsel acted unreasonably by failing to impeach two witnesses whose testimony at trial differed from what the defense had expected. According to Schmanke, a defense witness, Officer Sanders, changed his testimony so that it was not as favorable as he had originally hoped based on pretrial interviews. Also, Margaret Horton, a witness for the prosecution, adopted at trial a version of the events she reported in 1987 rather than a different version of the events she recounted in 1982. Schmanke hints that these changes were the result of intimidation by the government and faults his trial counsel for failing to investigate that possibility.

Initially, we note that Schmanke's insinuations of tampering with witnesses are wholly unsupported by the record and defense counsel clearly acted reasonably in not investigating that possibility. In addition, Schmanke is simply incorrect when he states that defense counsel failed to attempt to impeach Margaret Horton based on her change in testimony. In fact, Ms. Horton was vigorously cross-examined on this point. Finally, we do not believe that it was unreasonable for counsel to fail to attempt to impeach Sanders on the basis of the change in his testimony. For the defense to have impeached Officer Sanders would have been to shoot itself in the foot since Sanders was a defense witness and testified generally favorably to Schmanke. Indeed, it is difficult to see how Sanders could have been impeached given that the testimony at issue, even with the change, was favorable to Schmanke.

 d. Schmanke claims that his defense counsel acted unreasonably in failing to call witnesses at his detention hearing. As Schmanke has not informed us of any witness who would have aided his prospects for release, he plainly has not overcome the presumption that his counsel acted within the bounds of reasonable conduct. Moreover, Schmanke does not specify how his release would have changed the result of his trial. "While lack of diligence in obtaining a criminal defendant's pretrial release cannot be condoned, reversal of a conviction is not the appropriate remedy where the trial itself was not affected by the default." *United States v. Decoster*, 624 F.2d 196, 213 (D.C.Cir.1976).

 e. Schmanke's fifth example of his trial counsel's alleged constitutionally inadequate conduct involves counsel's decision not to call witnesses to impeach some of the prosecution's witnesses, especially Calvin Hedges. Specifically, Schmanke asserts that various inmates at the Michigan City prison could have been called to testify as to the poor character of some of the government's witnesses.

In a post-trial hearing, trial counsel explained his failure to call these inmates as follows. Apparently, word had gotten around the prison that Schmanke had given information to the government in hopes of reaching a plea agreement. The prisoners told an investigator for the defense that they were not interested in helping a snitch. After they were assured that Schmanke had not signed an agreement with the government, the prisoners agreed to testify about Schmanke and Hedges but, out of fear for their safety, refused to talk about other prisoners, including a group led by Mike Misenheimer. As Schmanke's defense was that he was coerced into participating in the money order scheme by Misenheimer and his associates, trial counsel concluded that the testimony of the prisoners would not be helpful.

It would be a rare case where counsel's conscious decision not to call a witness would amount to constitutionally ineffective assistance. As we have stated in the past, "a tactical decision not to call a particular witness ..., if made after adequate investigation and based upon counsel's rea-

sonable determination that damage to his client's case can thereby be avoided, cannot form the basis for a finding of ineffective assistance of counsel." *United States v. Curtis,* 742 F.2d 1070, 1074 (7th Cir.1984), *cert. denied,* 475 U.S. 1064, 106 S.Ct. 1374, 89 L.Ed.2d 600 (1986); *see also Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.").

In this case, trial counsel made a tactical decision not to call the witnesses out of fear that he might win a battle on Hedges' credibility but lose the war on the critical issue of coercion. Under the circumstances, that decision was eminently reasonable. Moreover, given that the potential witnesses would not have corroborated Schmanke's only defense and that defense counsel was able to make inroads on Hedges' credibility without the witnesses, no prejudice has been established from counsel's decision not to call the witnesses. *See United States v. Olson,* 846 F.2d 1103, 1109–10 (7th Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 131, 102 L.Ed.2d 104 (1988).

 f. Finally, Schmanke objects to his counsel's failure to request that he (Schmanke) be examined by a psychiatrist at government expense and failure to obtain prior reports on his mental condition. As noted above, Schmanke's defense at trial was that he was coerced by other prisoners into joining the scheme to alter and cash money orders. As his perception of the danger resulting from the threats he faced is an element of the defense of duress, Schmanke argues that expert testimony on his mental condition was critical.

The government does not dispute that Schmanke's mental condition was crucial to his defense. Instead, the government contends that the decision not to request a psychiatric examination was a tactical decision made jointly by the defendant and his counsel. Indeed, Schmanke's trial counsel told the court that "after discussion [it] was decided that it would be better to postpone [the appointment of a psychia-

trist] until after a verdict in this case for the purposes of the sentencing."

Where a defendant, fully informed of the reasonable options before him, agrees to follow a particular strategy at trial, that strategy cannot later form the basis of a claim of ineffective assistance of counsel. *United States v. Williams,* 631 F.2d 198, 204 (3d Cir.1980) (no ineffective assistance of counsel where defendant ultimately concurred in his trial counsel's tactical decision). To allow that would be to exempt defendants from the consequences of their actions at trial and would debase the right to effective assistance of counsel enshrined in the sixth amendment.

In this case, it is unclear what motivated Schmanke and his counsel to decide to postpone their request for a psychiatrist. Nevertheless, Schmanke does not deny that, after being informed of the relevant options, he participated in the decision and he is now stuck with it. Defense counsel's performance was not constitutionally deficient. Also, Schmanke has shown no prejudice from the decisions not to call a psychiatrist and not to request the reports of his previous examinations. There is no indication in the record that Schmanke's duress defense would have been assisted by the information in regard to his mental condition. Thus, trial counsel did not render constitutionally deficient assistance in this, or any other, respect.

## 2. Prosecutorial Misconduct

Schmanke claims that prosecutorial misconduct tainted his trial from start to finish. Although practically every aspect of the trial is claimed to have been infected, we will focus on three examples of what Schmanke believes to be misconduct: (1) intentional withholding of exculpatory material; (2) improper use of information gained during plea negotiations; and (3) improper argument to the jury. After reviewing the principles of law that govern claims of prosecutorial misconduct, we will discuss each of these allegations seriatim.

 Allegations of prosecutorial misconduct are generally rooted in the due

process clause.[7] The touchstone of such a constitutional claim is the fairness of the trial, not the culpability of the prosecutor. *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982). Thus, "we consider the prosecutor's conduct not in isolation but in the context of the whole trial in order to determine if such conduct was so inflammatory and prejudicial [that] it deprived the defendant of a fair trial." *United States v. Dahdah*, 864 F.2d 55, 59 (7th Cir.1988); *Solles v. Israel*, 868 F.2d 242, 245 (7th Cir.), *cert. denied*, — U.S. ——, 109 S.Ct. 2457, 104 L.Ed.2d 1011 (1989); *United States v. Bontkowski*, 865 F.2d 129, 133 (7th Cir.1988). We also recognize that there will be some cases where the prosecutor's misconduct does not rise to constitutional dimension. In that context, and only in federal cases, where courts exercise supervisory power, we will consider whether the prosecutor's conduct had a "substantial influence" on the result of the trial. *United States v. Pirovolos*, 844 F.2d 415, 425 (7th Cir.), *cert. denied*, — U.S. ——, 109 S.Ct. 147, 102 L.Ed.2d 119 (1988) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1966)); *United States v. Turk*, 870 F.2d 1304, 1308 (7th Cir.1989). We need not reach either of these tests, however, until the defendant has shown that the prosecutor actually engaged in misconduct during the course of the criminal proceedings. *United States v. Swiatek*, 819 F.2d 721, 730 (7th Cir.), *cert. denied*, 484 U.S. 903, 108 S.Ct. 245, 98 L.Ed.2d 203 (1987); *United States v. Spivey*, 859 F.2d 461, 465 (7th Cir.1988). With these standards in mind we now turn to the specific allegations of prosecutorial misconduct.

a. Schmanke claims that the prosecutor withheld from him three pieces of potentially exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *Brady* and its progeny require that the government, even in the absence of a specific request, disclose to the defendant inculpatory and exculpatory material evidence. *See United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). In this case, Schmanke claims the government (1) failed to produce his institutional record, which contained potentially exculpatory evidence, (2) failed to produce money orders and a template which, because they did not bear Schmanke's fingerprints, were also potentially exculpatory, and (3) failed to disclose that an important government witness, Larry Campbell, received lenient treatment in exchange for his testimony. We find no *Brady* violation and, thus, reject this claim of prosecutorial misconduct.

■ As to the institutional file, money orders and template, Schmanke is inaccurate in asserting that these items were not tendered to the defense. In fact, all of these items were given to the defense and all were relied upon by the defense at trial. As we have stated in the past, delay in producing exculpatory evidence does not violate *Brady* "[a]s long as the ultimate disclosure is not made too late for the defendant[ ] to make use of any benefits of the evidence...." *United States v. Ziperstein*, 601 F.2d 281, 291 (7th Cir.1979), *cert. denied*, 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980); *see also United States v. Perez*, 870 F.2d 1222, 1228 (7th Cir.1989); *United States v. Allain*, 671 F.2d 248, 255 (7th Cir.1982). That is the case here with respect to the institutional file, money orders and template. As for the promise of leniency, the government claims that there was no deal with Campbell and Schmanke has provided us with no evidence to the contrary. Under those circumstances, we cannot find that the government violated its duty under *Brady*.

■ b. Next, Schmanke claims that the prosecution improperly used information it received from him in the course of plea negotiations. Specifically, Schmanke

---

7. The fifth amendment may also be the basis of a prosecutorial misconduct claim where the government's conduct implicates the defendant's right to be free from compulsory self-incrimination. *See, e.g., Dortch v. O'Leary*, 863 F.2d 1337, 1343 (7th Cir.1988), *cert. denied*, — U.S. ——, 109 S.Ct. 1961, 104 L.Ed.2d 429 (1989). As we shall see, this right is not at issue in any of Schmanke's allegations of misconduct.

alleges that the government took the information he provided and used it in the second superseding indictment to increase the number of charges against him.

Federal Rule of Criminal Procedure 11, the rule that governs criminal plea negotiations, says that "any statement[s] made in the course of plea discussions with an attorney for the government which do not result in a plea of guilty" are not admissible at trial. Fed.R.Crim.P. 11(e)(6)(D). From this rule, Schmanke argues that the use of his statements by the government in composing the second superseding indictment amounted to misconduct.

Initially, it appears that the rule upon which Schmanke relies is inapplicable in a non-trial context. *United States v. Ocanas,* 628 F.2d 353, 357 (5th Cir.1980), *cert. denied,* 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 840 (1981) (Rule 11(c)(6) inapplicable to grand jury proceeding). More importantly, the government denies that it actually used any statements made by Schmanke in the course of plea negotiations and, once again, no evidence has been produced to the contrary. The district court held a hearing on this issue and found that the government had not used the information. That finding is not clearly erroneous and, thus, the government has not engaged in any misconduct with regard to the plea negotiations.

 c. Schmanke's last allegation of prosecutorial misconduct involves the government's closing argument. In that argument, the prosecutor discussed the testimony of Frank Baker, a co-conspirator in the money order scheme, who entered into a plea bargain with the government.

And if you remember the testimony of Frank Baker—and Frank Baker wasn't here as any favor to the government— you heard Frank Baker testify as to his plea agreement. There was no agree-

ment concerning cooperation.... As you can see he wasn't necessarily the most cooperative witness with the government. In fact ... I asked very few questions on direct because I was hoping that the defense attorneys would come in and ask additional questions of Mr. Baker, and get him to admit things he wouldn't necessarily admit for me.

But the important thing about Frank Baker was ... his testimony on cross when they were asking him about incriminating himself, and isn't it true that you incriminated yourself to Postal Inspector Egan, he told the defense attorney on cross that he didn't have to incriminate himself. That the letters incriminated him. Just like these letters incriminate Susan Glover [a co-defendant] and just like the letters that Frank Baker drafted in June of '82 incriminate Mr. Weaver.

Schmanke finds two improprieties in this section of the closing argument. First, he claims that the prosecutor's argument impermissibly suggested that the defense should have delved into a certain subject area with Frank Baker. Schmanke analyzes that suggestion as tantamount to a statement that the defense should have called a witness; a statement he believes we held improper in *United States v. Pollard,* 790 F.2d 1309, 1314 (7th Cir.1986). Second, Schmanke claims that the argument impermissibly suggested that he should be found guilty simply because of the guilt of Frank Baker, a co-conspirator.

Neither of the arguments made by the prosecutor was improper. We do not believe that the prosecutor's comment on the failure of the defense to ask Baker more questions was equal to a suggestion that the defendant should have called witnesses. Taken in context, the prosecutor's statement merely sought to buttress his earlier argument that Baker was not testifying as a concession to the government.[8] In any

---

8. The government notes that *Pollard* has been overruled by *United States v. Sblendorio,* 830 F.2d 1382, 1392 (7th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1034, 98 L.Ed.2d 998 (1988), to the extent it held that the prosecutor may not comment on the ability of the defense to produce a witness if it wished to do so. Neverthe-

less, *Sblendorio* left open the question posed by the defendant in this case: whether the prosecution can comment on the failure of the defendant to call a particular witness when no reciprocal comment was made by the defense. We also need not resolve that question given our belief that, taken in context, the prosecutor's

event, because Schmanke did not object to this part of the argument at trial, the plain error rule applies. Thus, even if there was error, it would not require a reversal be-cause the error did not result in a "miscarriage of justice." *United States v. Keskey*, 863 F.2d 474, 482 (7th Cir.1988); *Swiatek*, 819 F.2d at 731.

The prosecutor's comments with regard to Baker's letters were also proper. It is difficult to understand what Schmanke is complaining about since the prosecutor did not even mention Schmanke when discussing the letters. The district court rejected the contention that the prosecutor was trying to argue that since Baker was guilty, Schmanke must also be guilty. We agree that the prosecutor attempted to draw no such parallel and thus find nothing improper in his comments.

■■■■ In sum, we find no misconduct on the part of the prosecutor. At the very least, there was not such misconduct that we could say that the defendant was deprived of a fair trial.[9]

### E. Larry Weaver

■■■■ Weaver is the lone non-inmate in this group of defendants. He was charged only in Count 1, the conspiracy count. The jury found him guilty and the court sentenced him to one year in prison and ordered him to pay a fine of $1000. On appeal, Weaver challenges his conviction on two interrelated grounds. First, he claims that there was insufficient evidence to show that he knowingly participated in the mail order scheme. Second, he asserts that the district judge erred in failing to grant his motion for acquittal. We will discuss these claims together because, although the standards for the two claims are slightly different, *see United States v. Douglas*, 874 F.2d 1145, 1155 n. 12 (7th Cir.1989), Weaver's challenge fails under either standard.

■■■■ In this circuit there are three elements to the crime of conspiracy: (1) an agreement between two or more persons to commit an unlawful act; (2) intentional participation in the conspiracy by the defendant; and (3) an overt act in furtherance of the conspiracy by one of the conspirators. *United States v. Mealy*, 851 F.2d 890, 896 (7th Cir.1988); *United States v. Gabriel*, 810 F.2d 627, 633–34 (7th Cir.1987). The government has the burden of proving each of these elements but may do so through the use of circumstantial evidence. *United States v. Nesbitt*, 852 F.2d 1502, 1510 (7th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 808, 102 L.Ed.2d 798 (1989). Also, it is now well established that once the government has shown the existence of a conspiracy, only "slight evidence" is needed to prove that a particular person was a member of the conspiracy. *Id.;*

comment did not pertain to the failure of the defense to call a witness or ask particular questions.

9. Schmanke makes two other arguments which are without merit. First, he claims that the second superseding indictment was based on misleading hearsay. Specifically, he claims that the government reported the testimony of Calvin Hedges to the grand jury without informing them of promises made to Hedges by the government in exchange for his testimony. Even if such conduct would justify throwing out the indictment, a question we do not reach, Schmanke has made his argument too late. Any errors made during grand jury proceedings which could affect whether there was probable cause to charge are harmless once the jury has found the defendant guilty. *United States v. Mechanik*, 475 U.S. 66, 67, 106 S.Ct. 938, 940, 89 L.Ed.2d 50 (1986).

Second, Schmanke claims he was denied counsel during a post-trial hearing to determine whether he wanted new counsel for sentencing. In *United States v. Wadsworth*, the Ninth Circuit held that a hearing to determine whether new counsel should be appointed is a critical stage of the proceedings since the right to have counsel is potentially at stake. 830 F.2d 1500, 1510 (9th Cir.1987). Thus, *Wadsworth* held that a defendant has a right to representation by counsel at that hearing. However, so long as former counsel represents the defendant at that proceeding and has not taken an adversary or antagonistic stance toward the defendant, the right to representation has been fulfilled. *See id.* at 1511 (new counsel required where former counsel took an adversary and antagonistic posture toward defendant). In this case, Schmanke's counsel was present at the hearing on change of counsel and there is no indication that he took any position opposed to that of the defendant. Thus, the defendant was not deprived of counsel at the hearing on change of counsel for sentencing.

*United States v. Gironda,* 758 F.2d 1201, 1217 (7th Cir.), *cert. denied,* 474 U.S. 1004, 106 S.Ct. 523, 88 L.Ed.2d 456 (1985).

Weaver admits that the government has shown the existence of a conspiracy, as well as overt acts taken in furtherance of the conspiracy. He claims, however, that the government has adduced insufficient evidence to show that he intentionally participated in the conspiracy. We disagree.

Weaver bases his arguments on an incomplete view of the evidence. He would like us to disaggregate the evidence against him into its component parts and then analyze each of those parts separately to determine if there was sufficient evidence of his intentional participation. We would probably agree that there was not sufficient evidence if we accepted Weaver's mode of analysis. None of the pieces of evidence, taken individually, shows that he intentionally participated in the conspiracy. However, when the evidence is aggregated and taken as a whole, as we must do in assessing this sort of claim, we believe there is ample evidence to show that Weaver engaged in "informed and interested cooperation." *Gabriel,* 810 F.2d at 634.

Several witnesses testified at trial concerning the activities of Weaver in connection with the conspiracy. First, Margaret Horton testified that she received a $200 money order from Mark Schmanke, cashed it, and then sent the proceeds via Western Union to Larry Weaver. Second, handwriting and fingerprint experts testified that they did not find Weaver's handwriting or fingerprints on any of the money orders introduced at trial.

The most important witness against Weaver was Frank Baker, an inmate co-conspirator. Two letters were introduced at trial from Baker to Earl Cooper, a former inmate. One of the letters stated that "Larry Weaver has been doing a few things for me. You might call him and see if he'll drive you around down in Greene County to sell a few wallets. He told me he would help in any way he can." Baker testified that the word "wallet" was used as a code word for money orders. The second letter stated that "Larry [Weaver]

is working through the week but said if you come down there he will drive you around on Saturday and Sunday to take care of business. He's the one who sends me the wallets."

On direct examination by the government, Baker testified that Weaver had, on his instructions, sent ten money orders to the wife of a fellow inmate. On cross-examination, however, Baker admitted that Weaver never received any money as a result of the scheme and may not have been aware that the money orders were altered.

We believe this evidence was sufficient evidence to permit a reasonable juror to find that Weaver intentionally participated in the conspiracy. Weaver sent small denomination money orders on behalf of Baker and told Baker he would assist in getting the money orders cashed. He also received the $200 from Margaret Horton. Taken together this evidence shows that Weaver participated in both ends of the money order transactions. From that, a reasonable juror could find that Weaver knew the nature of the scheme and, given his offers of assistance to Baker, intentionally participated in its fruition. Thus, we reject Weaver's claim that there was insufficient evidence from which a reasonable juror could find him guilty of conspiracy.

### III.

For all the reasons discussed above, the convictions of these defendants are AFFIRMED.