940 F.2d 666
 UNPUBLISHED DISPOSITION
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Harikrushna PATEL, Petitioner-Appellant,
v.
UNITED STATES of America, Respondent-Appellee.
 No. 90-1016.
 United States Court of Appeals, Seventh Circuit.
 Argued May 28, 1991.
Decided July 26, 1991.
 
 Before CUMMINGS, WOOD, JR. and FLAUM, Circuit Judges.
 
 ORDER
 
 1
 After a jury found him guilty on several counts relating to a motel arson, Harikrushna Patel attempted to avoid his sentence by faking a suicide and fleeing the jurisdiction. Although successful for a time, he eventually was apprehended in Florida and was sentenced to a seven-year term of imprisonment followed by a five-year term of probation. He was also ordered to pay restitution. Since that time, Patel, with the assistance of his father, has devoted himself to a continuing campaign to overturn his conviction or at least get a sentence reduction. That effort appears doomed to failure, however; this court has already affirmed Patel's convictions on direct appeal and we now affirm the denial of his section 2255 petition without an evidentiary hearing.
 
 
 2
 Although Patel is now represented by an attorney, this has not always been the case. He and his father "bombarded" the district court with well over fifty pro se submissions in a two-year period, thereby creating a "logjam" of motions, motions for reconsideration, and motions for reconsideration of motions for reconsideration. The district court examined these documents with a commendable degree of patience and was willing to sacrifice formality for the sake of fairness in considering the plethora of issues raised. Even the submissions of Patel's father were given thorough consideration (though their author is neither a formal party to these proceedings nor an attorney); the father has thereby achieved a sort of de facto intervenor status in this litigation.
 
 
 3
 Happily, most of the arguments made below have not made their way into Patel's appellate brief; his retained appellate counsel presents this court with only one basis for ruling in his client's favor--the ineffective assistance of Patel's trial counsel, Gerald Werksman. That argument is in itself fairly voluminous; Patel lists some seventeen witnesses and pieces of documentary evidence that he believes his counsel should have offered at trial. Sheer volume does not necessarily equate with merit, however, even if we overlook the many shortcomings in the proposed evidence.
 
 
 4
 The evidence at trial portrayed Patel as a man in a fix. He was the sole general partner in a limited partnership whose purpose was to run the Town and Country Motel. As the manager of the motel, he was fully aware that the business was experiencing significant cash flow problems; its account with a telephone equipment leasing company was in default and the November 1982 mortgage payment bounced and was never made good. Prospects of a quick recovery were not bright, moreover, as in October 1982 one of the motel's main clients withdrew its business due to the poor condition of the motel. Patel sought assistance from his limited partners, but they refused to advance additional funds. And to top it all off, Patel received notice on November 29, 1982, that the Eagle Star Insurance Company was going to cancel the motel's fire insurance policy because of a failure to comply with recommendations on safety and sanitary measures.
 
 
 5
 On the evening of December 5, 1982, a fire erupted in the north wing of the motel. Investigators immediately suspected arson, and a full inquiry led them to Patel. The evidence revealed that Patel offered money to the motel's maintenance man, Raul Lopez, to persuade him to set fire to the building. Lopez himself refused the offer but mentioned it to a friend, Charlene Best, who in turn solicited Leroy and Kevin Elmore. The Elmores agreed to do the job, and Lopez conveyed this news to Patel.
 
 
 6
 On the morning of December 5, Patel instructed the motel's desk clerk to move motel guests from the north wing to the south wing. Later that day, Patel, his wife Bina, Lopez, Best, and the Elmores met to finalize their plans. The Elmores set fire to the motel later that evening and received their payment the next day from Lopez, who in turn had collected the money from Bina Patel.
 
 
 7
 The theory underlying Patel's claim is that the government's witnesses were liars, that the government knew that its witnesses were liars but put them on the stand anyway, and that his attorney was too incompetent even to notice what was going on, much less to combat it. A review of the transcript reveals otherwise. Not only did Werksman vigorously and thoroughly cross-examine the government's witnesses, in the process acquainting the jury with significant impeaching material, but he also presented an affirmative defense of alibi and offered the testimony of a half dozen witnesses claiming that Patel had been out of town on December 5. The district court, which presided over Patel's trial and was therefore thoroughly familiar with Werksman's efforts, observed that Patel's trial counsel "appeared to be well prepared" and "vigorously cross-examined, examined and advocated [his client's] interests." We cannot conclude, therefore, that Werksman's performance fell below "an objective standard of reasonableness." United States v. Ashimi, 932 F.2d 643, 648 (7th Cir.1991) (citing Strickland v. Washington, 466 U.S. 668, 690 (1984)); see United States v. Williams, No. 89-1773, slip op. at 8-9 (7th Cir. June 4, 1991).
 
 
 8
 But if there were any doubts as to Werksman's performance, it is also clear that Patel's proposed evidence fails to satisfy the prejudice prong of Strickland. Much of this proposed evidence relates to economics. Patel contends that the motel was doing well financially, that he could not have directly benefitted from the insurance proceeds because they were earmarked for the mortgage company, and that the insurance claim was not fraudulent because it was professionally developed and was for less than the amount of restitution.
 
 
 9
 It is difficult, however, to see how this devotion to economics would have changed the outcome in this case. As to Patel's assertion that the motel was not in a precarious financial situation, the district court correctly noted that the evidence at trial, "however defendant may himself wish to dispute it, indicated that the motel was not doing well and had serious cash flow problems which perhaps could be alleviated by insurance payments, particularly recovery for business interruption." As to the assertion that Patel would not gain directly from the insurance proceeds, there is some indication in the record that Werksman introduced and developed this theory at trial. To the extent that he did not, however, it is clear that the government was primarily pursuing the theory that Patel gained indirectly "by the survival of a business which he managed and in which he had an interest." Patel's proposed evidence thus might have negated a motive, but that evidence would by no means have established that Patel had no motive, particularly when the government primarily emphasized the indirect and not the direct benefit. As to the third assertion, the government did not claim that Patel had engaged in fraud by overinflating the insurance claim. Quite to the contrary, and as noted by the district court, the government's position at trial was that Patel had no business filing any sort of insurance claim because he had arranged for the arson.
 
 
 10
 The remainder of Patel's proposed evidence purportedly would have impeached the testimony of various government witnesses, although in some cases it is unclear exactly how the impeachment would have worked. The circumstances surrounding the trial, however, indicate that added impeachment would have been merely cumulative and unlikely to have had any cognizable effect. As the district court felt compelled to instruct the jury, this was "one of those cases where somebody hasn't been telling the truth." In denying Patel's section 2255 petition, the district court further observed:
 
 
 11
 Without question, various witnesses changed their stories between first being questioned and the trial. Without question, there were numerous inconsistencies between the various versions of events as related by the witnesses. But those changes and inconsistencies were known to the jury and they were a primary basis for the cross-examination by [Patel's] counsel. It was up to the jury, ultimately, to determine credibility, and it did.
 
 
 12
 In other words, Patel had and introduced ample impeachment evidence. It was of the type, moreover, that was far more damaging than the somewhat peripheral impeachment that he now claims should have been offered. (Werksman's cross-examination of the government's principal witnesses, Lopez and Best, exhaustively explored the fact that the former's testimony was inconsistent with his statement to an investigator and the latter's testimony was inconsistent with her testimony before the grand jury.) Yet the jury believed the government's witnesses despite evidence that they might have been lying, and it is therefore unlikely that this cumulative, and comparatively minor, impeachment would have tipped the scales in Patel's favor. See United States v. Weaver, 882 F.2d 1128, 1139 (7th Cir.), cert. denied, 110 S.Ct. 415 (1989).[1]
 
 
 13
 Although Patel makes conclusory assertions to the contrary, every indication from this record is that he was aided by an able and competent counsel who did as much with the case as could reasonably be expected. What is more, there is no indication from this record that the additional evidence would have caused the jury to alter its finding of guilty. Patel's trial would have lasted much longer, but the end result would have been the same.
 
 
 14
 AFFIRMED.
 
 
 
 [1]
 Patel's brief also discusses an affidavit containing the proposed additional testimony of Leslie Shary, a witness who testified on behalf of the government and who was also called to testify on behalf of the defense. In this affidavit, purportedly signed by Shary, the affiant claimed that she had been threatened and coerced by Lopez. (Footnote continued on page 5.)
 The affidavit is apparently no longer a part of this case, however. In responding to it, the government raised serious questions about the authenticity of the affidavit's signature (the government noted that the signature bore a suspicious resemblance to the other affiants' signatures and also submitted its own affidavit claiming that Shary had not signed the document). And in the face of these allegations, the record indicates that Patel "withdrew" the Shary affidavit (along with two other affidavits that were of questionable origin) and disclaimed any reliance on its contents.