**UNITED STATES of America**

v.

**Louis GUGLIELMI.**

**No. C–CR–85–59.**

United States District Court, W.D. North Carolina, Charlotte Division.

March 19, 1990.

---

Thomas J. Ashcraft, U.S. Atty., Charlotte, N.C., for plaintiff.

Harold J. Bender, Charlotte, N.C., for defendant.

## ORDER

ROBERT D. POTTER, Chief Judge.

THIS MATTER is before the Court on remand from the Fourth Circuit for reconsideration of this Court's order denying Defendant's Motion under Federal Rules of

Criminal Procedure 35(b) for reduction of sentence. A hearing was held on January 30, 1990. Defendant was represented by Harold J. Bender, Esq., and the Government was represented by Thomas J. Ashcraft, United States Attorney.

The Fourth Circuit interpreted this Court's order filed May 13, 1988 as suggesting "... only two rationales for the denial." (Slip Op. No. 88–7656, p. 5 dated June 9, 1989 [877 F.2d 60 (table) ]).

The Fourth Circuit first considered that portion of this Court's order which stated: "On appeal the Fourth Circuit addressed this contention ... *and determined that the sentence should not be disturbed.*" The Fourth Circuit, on page 7 of its opinion, stated:

In stating that the proportionality analysis portions of *Guglielmi I* conveyed our instruction that Guglielmi's sentence "should not be disturbed" the sentencing court indicates to us that it may have believed that *Guglielmi I* removed its discretion to conduct a plenary view of Guglielmi's sentence in a Rule 35(b) proceeding.

The Fourth Circuit apparently misconstrued this Court's statement which was taken out of context of the following paragraph in this Court's order:

Defendant is still contending that the Court's sentence was so severe that it violated the Eighth Amendment. On appeal the Fourth Circuit addressed this contention by Defendant and determined that the sentence should not be disturbed.

This Court was addressing the Defendant's contention that the Defendant's sentence was so severe that it violated the Eighth Amendment, and was answering that contention by stating that the Fourth Circuit had already ruled that the sentence did not violate the Eighth Amendment and therefore should not be disturbed for that reason. This Court is well aware that, as the Fourth Circuit said on page 8 of its remand order, it is:

... axiomatic that the disposition of a Rule 35(b) motion is within the sound discretion of the sentencing courts (citing cases).

This Court did not interpret the Fourth Circuit to mean that *Guglielmi I* removed its discretion to conduct a plenary review of Guglielmi's sentence in a Rule 35(b) proceeding, and if deemed proper reduce the sentence.

The Fourth Circuit's second reason for remand was stated as follows:

The second rationale for the order, representing the sentencing court's view of the gravity of Guglielmi's offenses indicates more clearly than the first a principled exercise of discretion. We disagree, however, that the principle has a basis in law. (citing cases).

The sentencing court offered no citation to either of the instant transportation statutes or their legislative histories, or to a case from any other court, to support its view that trafficking in obscene materials is in some sense a "violent" crime because it foments violence by those who view the materials. We have not unearthed any authority to support this conception of the statutes, and were directed to none by the United States during oral argument.

What this Court said in denying the Defendant's Rule 35 motion was:

Contrary to Defendant's contention that obscenity crimes are considered relatively unserious, this Court considers obscenity crimes very serious, which *can* (emphasis added) result in "victims," that is those who view these films, committing sexual crimes.

This Court did *not* say:

... that trafficking in obscene materials is in some sense a "violent" crime because it *foments violence* (emphasis added) by those who view the materials ...

The Fourth Circuit, in its opinion at footnote 7, page 10, cited the "Report of the Commission on Obscenity and Pornography" (1970) and "Attorney General's Commission on Pornography, *First* Report," 215 (1986) (emphasis added) for the proposition that there is no evidence that erotic materials cause increased rates of sexual crime or sexual deviancy.

More recent studies as set out in "Attorney General's Commission on Pornography *Final* Report" 1986, Section 5.2.2, which is titled: *Nonviolent Materials Depicting Degradation, Domination, Subordination or Humiliation,* pp. 329–335, state the Commission's conclusion on page 333:

We should make clear what we concluded here. We are not saying that *everyone exposed to material of this type has his attitude about sexual violence changed.* We are saying only that the evidence supports the conclusion that substantial exposure to degrading material increases the likelihood for an individual and the incidence over a large population that these attitudinal changes will occur. And we are not saying that everyone with these attitudes will commit an act of sexual violence or sexual coercion. We are saying that such attitudes will increase the likelihood for an individual and the incidence for a population that acts of sexual violence, sexual coercion, or unwanted sexual aggression will occur. *Thus, we conclude that substantial exposure to materials of this type bears some causal relationship to the level of sexual violence, sexual coercion, or unwanted sexual aggression in the population so exposed.* (Emphasis added).

"Degradation" as used by the Commission is defined on page 331 of the Report as follows:

The degradation we refer to is degradation of people, most often women, and here we are referring to material that, although not violent, depicts people, usually women, as existing solely for the sexual satisfaction of others, usually men, or that depicts people, usually women, in decidedly subordinate roles in their sexual relations with others, or that depicts people engaged in sexual practices that would to most people be considered humiliating. Indeed, forms of degradation represent the largely predominant proportion of commercially available pornography.

A summary of the facts as stated by the Fourth Circuit in its opinion in *Guglielmi I*

appearing in 819 F.2d 451–54 (4th Cir.1987) were as follows:

HAYNSWORTH, Senior Circuit Judge:

Guglielmi was convicted upon multiple counts of an indictment charging interstate transportation of obscene films and use of a common carrier for interstate transportation of the same films. His first, and perhaps principal, argument is essentially that the materials are so disgusting and repellent that they could not be found to appeal to the prurient interest of the average person, nor to the average zoophiliac. The latter branch of his contention is premised upon his subordinate contention that there is no such thing as an average zoophiliac. The argument is not without ingenuity, but we reject the notion that greatly offensive material has the protection of the First Amendment while less offensive material does not.

### I.

Guglielmi was the operator of a warehouse in Baltimore, Maryland from which he supplied adult bookstores with films, written materials, pictures and sexual aids and devices. The operator of such a bookstore from Charlotte, North Carolina was arrested, and the FBI became interested in some films found there which included scenes of bestiality. The operator of the bookstore said that he had purchased those films from Guglielmi.

Thereafter, an FBI agent, operating undercover, ordered more of such films from Guglielmi and received them in Charlotte upon the conclusion of shipments from Baltimore. Guglielmi was indicted in the Western District of North Carolina. The first count charged him with conspiring with the owner of the Charlotte bookstore and the owner's son to ship obscene materials in interstate commerce. The next ten counts were in five pairs. The first of the pairs charged aiding and abetting interstate transportation of a named film or films in violation of 18 U.S.C.A. § 1465 (1984); the second of the pairs charged him with the use of

a common carrier for the interstate transportation of the same film or films in violation of 18 U.S.C.A. § 1462 (1984).

A jury convicted him on all counts. After pairing the counts for sentencing, the district court imposed a five year sentence on the conspiracy count and five years on each of the paired transportation counts. Only the first two were to run concurrently while the remainder were to run consecutively, to make a total sentence of twenty-five years. It also imposed fines totaling $35,000.

## II.

The parties have presented this case as if all of the portrayals in the eight named films are bestial. Actually that is not the case. We are informed that in six of the eight films there are portrayals of a variety of sex acts among humans. In one of them, entitled "Snake Fuckers," for example, use of what appears to be a live eel is only one of many incidents. As the film opens, a young woman is shown handling what appears to be a large live eel that she drops on the floor. An older woman appears and the two remove each other's clothing and perform cunnilingus. The younger woman then inserts the eel into the vagina of the older woman. She moves it back and forth. There is a film break, and the eel is then shown inserted in the woman's anus while another object has been inserted in the woman's vagina. The two objects are moved back and forth in their separate orifices.

There is a film break and the two women, now clothed, and a man are shown seated at a kitchen table while frying on the kitchen stove are what appears to be cut up pieces of eel. The man suddenly rises and displays his erect penis. The older woman performs fellatio upon him while the man and younger woman disrobe and touch busy tongues together. The man and the older woman are then shown engaged in vaginal intercourse. The man withdraws in time to spray his ejaculate partly into the open mouth of the woman and partly upon her face and breasts. The woman then licks the head of the penis clean.

Two of the films are exclusively bestial.

In "Horny Boar," a young woman in a short dress teases a boar. The boar persistently seeks to raise the back of her skirt with his snout, though the skirt falls back each time. Finally, the woman removes her dress and panties and assumes a submissive crouching position on the straw covered floor. A second woman throws a rough cloth on the shoulders and upper back of the crouching woman to provide some protection from the boar's pawing hooves. The boar mounts her and she reaches back with her right hand to guide his penis into her vagina. When the boar is finished, the woman climbs over a pile of baled hay and leaves the scene as the boar looks eagerly after her. Later the woman returns. This time with little ado she takes the submissive crouching position. The boar mounts her, and again she reaches back with her right hand to guide his penis. When done, the boar falls off to one side in apparent exhaustion or relaxation.

The other film, "Horsepower," displays two naked women massaging a small pony's penis with their hands and mouths. One woman then positions herself beneath and beside the pony and directs the pony's penis to her genitals. There is little doubt that some touching occurs, but, because of the awkwardness of the position, there is some doubt about vaginal penetration. A large dog then appears. The women fondle and manipulate his penis. They then have vaginal intercourse with the dog in two different positions.

This is enough, perhaps to demonstrate Guglielmi's proposition that the films are absolutely disgusting, but it should also demonstrate that there is support for the testimony of the government's expert witness that each of the films would have an appeal to the prurient interest of an otherwise sexually normal person. Some men will find sexual *degradation* (emphasis added) of a

woman titillating, while the prurient interest of some males may be aroused by explicit portrayals of a woman's genitals during lesbian activity.

There is a reference in the record by the defendant's "sexologist" to a film showing the insertion of comparatively large objects, a fist and a beer can, into a woman's vagina, though she thought that the film had scientific value in its demonstration of the elasticity of the vagina.

The government's expert also expressed the opinion that the films would appeal to the prurient interest of a deviant sexual group known as zoophiliacs, people who fantasize about sex acts with animals.

The Court has cited the Fourth Circuit's summary of facts in 819 F.2d 451 so that this Order may be evaluated in the light of those facts.

The Defendant in his reply filed February 15, 1990 to the Government's Response stated: "In fact, considering the only relevant scale—the universe of obscene materials—the films in this case are rather benign." To this Court, the films as described above depicted the most base form of degradation of women and are far from "benign."

The films certainly depicted sexual conduct in a patently offensive way and clearly lacked any redeeming value.

The Defendant was a large scale dealer in pornographic film and was in the business before the F.B.I. ever heard of him, having sold sexually explicit films since at least the early 1970's. The record reflects that the Defendant did business with 73 stores in North Carolina.

As stated in the Government's Response to Defendant's reply filed February 22, 1990:

At trial considerable evidence was adduced to show that the defendant was in the business of distributing bestiality films interstate. Lloyd M. Hartley testified that he had known the defendant since the early 1970s and had bought sexually explicit materials for his own stores from him through Central Sales,

Inc. in Baltimore since that time. (Trial Transcript, Vol. II, p. 6, hereinafter "Tr." followed by volume and page number; Tr. 2–14). From about July 1983 until about April 1984 the defendant's business was the exclusive source of the animal sex films Hartley sold. Hartley said that he never kept a particularly large stock of bestiality films and that he sold them within several weeks of receiving them and then reordered—all from the defendant's business. (Tr. 2–608–609). His testimony indicated that there was a specific genre of bestiality films, and he made no attempt to draw a distinction between those introduced at trial and the general type he had bought and sold before from the defendant.

FBI Agent Carl Chandler testified that he bought materials from Hartley's store during the time that Hartley had obtained bestiality films exclusively from the defendant. Specifically he said that on November 25, 1983, he "observed 21 different bestiality films in the glass counter on display for sale." (Tr. 1–184). When asked if he viewed any of these films at Hartley's store, he indicated that he had viewed a sample in a projection booth: "I observed a couple of films. One pertaining to intercourse, several women engaged in intercourse with a small pony and a dog, and also there was a film involved [sic] of a male involved in sex with a chicken." (Tr. 1–184). As with Hartley, Chandler's testimony indicated that there was a specific genre of bestiality films, and he made no effort to distinguish between the eight films directly related to the charges and other films observed at Hartley's business which had been obtained from the defendant.

FBI Agent Robert Drdak testified that he had visited the defendant's business in Baltimore in an undercover capacity on September 20, 1984. There he was given a tour of the business by the defendant. (Tr. 2–192–194). Drdak said at one point:

I approached Mr. Guglielmi and I asked him where were the animal

films, that I hadn't seen any of them in my trip to the warehouse.

He took me to a small room.... [I]t consisted of several tables, shelves around the whole four walls, counters. And contained in that room were numerous eight millimeter, super eight millimeter films of sex between humans and animals, sex involving urination on partners and a number of foreign films.

He advised me that when I first asked him about the animal films, he said from now on when you call, he said, don't call them animal films. Refer to them as specialty films and give me the number, and I will know what you're talking about. (Tr. 2–194–195). Drdak also testified as follows:

Q [by prosecutor] What, if any, warning did the defendant give you in telling you about ordering on the phone of bestiality or animal films?

A Again, he said, in the future, refer to them as specialty films and give me the number.

Q What, if any, statement did he make with regard to car [sic] and selling certain types of material?

A Well, again, you have to be careful with those, and he referred to the animal films, the bestiality films. (Tr. 2–195).

Drdak also testified that at a later point he spent time alone in the specialty room and observed that there were multiple copies of films depicting sex between animals and humans. (Tr. 2–197 and 2–199–200).

FBI Agent William F. Smith, Jr. also testified at trial. On direct examination, Smith testified about the business records of the defendant which were obtained during a search of Central Sales, Inc. in Baltimore on September 27, 1984. *See generally* Tr. 3–116–125 and Government Exhibits 16 through 22 and 30 through 32 and 34. He said that the records showed 73 stores in North Carolina doing business with Central. (Tr. 3–121 and 3–125). Exhibit 34 contains numerous reels of bestiality films taken from Central (Tr. 3–126 and 3–129–130); these are in addition to the 238 reels which Smith described in his February 1, 1990, affidavit. Smith specifically testified that the films in Exhibit 34 were sent interstate. (Tr. 3–133).

The Court notes that defense counsel Alan M. Dershowitz, Esq. contends that Defendant has a "superb institutional record," and the Court does not dispute that statement based on the information furnished. However, that does not detract from the Court's principle reason for incarceration, and that is deterrence.

There is one matter in the Fourth Circuit's opinion which the Court feels it should address even though it was not expressed as a reason for remand: In its opinion remanding the Rule 35 petition to this Court, the Fourth Circuit said:

Despite Guglielmi's request for a hearing, the sentencing court denied the motion four days after its filing without a hearing and without receiving any submission from the United States.

This Court hears literally hundreds of guilty pleas and tries scores of criminal cases each year, and usually has to review the file in order to recall the case.

However, this case involved such egregious obscene film that the Court will never forget the case nor the expression on the faces of the jury which had to view this pornography, and therefore the Court did not feel it necessary to review the file in detail.

One other matter the Court wishes to address is Mr. Dershowitz's statement in his letter of January 30, 1990 in which he relates that he could not be present at the Rule 35 hearing because of the birth of his daughter and that the denial of his request for a continuance was unreasonable. He further stated in that letter: "I note that there was only one prior request made by the defendant for an adjournment of the hearing."

This appears to be an incorrect statement. The mandate from the Fourth Circuit remanding this case to this Court for reconsideration was filed July 5, 1989.

This Court holds its criminal terms in August, October, December, February, April, and June each year. Thus, the Rule 35 Motion was scheduled to be heard in August. At the request of Mr. Harold Bender, local counsel, the hearing was continued to October because Mr. Bender was involved with *U.S. v. James O. Bakker.* The case was continued again from the October Term at the request of Defendant's counsel, Mr. Bender, to the December Term. On November 13, 1989, Mr. Bender filed a motion for continuance on the grounds that he was involved in the appeal to the Fourth Circuit in the *Bakker* case, and that Mr. Dershowitz had a conflict during the week of November 20, 1989 and had requested the matter be continued to the February 1990 Term. (Because of the heavy criminal docket, non-jury matters are usually heard the last week of the month preceding the trial terms.)

The Court granted that third motion by Defendant and stated in its Order filed November 15, 1989:

> ... Thus it appears to the Court that Defendant's Motions to Continue will have delayed the hearing of this matter at least six months.
>
> Obviously such delays greatly inconvenience the Court. The Court is not under an obligation to conduct a hearing on a Rule 35 Motion. While the Court will allow one more continuance of the matter, there will be no more continuances of this matter. If defense counsel is unable to attend the hearing during the February 1990 Charlotte Criminal Term, the matter will be decided by the Court without a hearing.

As noted, Mr. Bender attended the hearing on January 30, 1990, but Mr. Dershowitz did not.

In view of the large volume of obscenity distributed by the Defendant over a period of years, and after extensive reconsideration of Defendant's arguments, the Court believes that in view of all the facts of this case that the sentence was fair and just under the circumstances and should not be disturbed.

NOW, THEREFORE, IT IS ORDERED that Defendant's Petition for reduction of sentence pursuant to Rule 35 of the Federal Rules of Criminal Procedure is DENIED.