UNITED STATES of America, Appellee,

v.

Louis GUGLIELMI, Appellant.

No. 85–5255.

United States Court of Appeals,
Fourth Circuit.

Argued July 16, 1986.

Decided May 21, 1987.

Rehearing and Rehearing En Banc
Denied July 1, 1987.

Alan M. Dershowitz, Cambridge, Mass., (Victoria B. Eiger, Nathan A. Dershowitz, Dershowitz & Eiger, P.C., New York City, Harold J. Bender, Charlotte, N.C., Louis Sirkin, Sheldon H. Braiterman, Braiterman & Johnson, P.A., Baltimore, on brief), for appellant.

Debra J. Stuart, Asst. U.S. Atty., Charlotte, N.C. (Charles R. Brewer, U.S. Atty., Asheville, N.C., on brief), for appellee.

Before ERVIN and WILKINSON, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

HAYNSWORTH, Senior Circuit Judge:

Guglielmi was convicted upon multiple counts of an indictment charging interstate transportation of obscene films and use of a common carrier for interstate transportation of the same films. His first, and perhaps principal, argument is essentially that the materials are so disgusting and repellent that they could not be found to appeal to the prurient interest of the average person, nor to the average zoophiliac. The latter branch of his contention is premised upon his subordinate contention that there is no such thing as an average zoophiliac. The argument is not without ingenuity, but we reject the notion that greatly offensive material has the protection of the First Amendment while less offensive material does not.

## I.

Guglielmi was the operator of a warehouse in Baltimore, Maryland from which he supplied adult bookstores with films, written materials, pictures and sexual aids and devices. The operator of such a bookstore from Charlotte, North Carolina was arrested, and the FBI became interested in some films found there which included scenes of bestiality. The operator of the

bookstore said that he had purchased those films from Guglielmi.

Thereafter, an FBI agent, operating undercover, ordered more of such films from Guglielmi and received them in Charlotte upon the conclusion of shipments from Baltimore.

Guglielmi was indicted in the Western District of North Carolina. The first count charged him with conspiring with the owner of the Charlotte bookstore and the owner's son to ship obscene materials in interstate commerce. The next ten counts were in five pairs. The first of the pairs charged aiding and abetting interstate transportation of a named film or films in violation of 18 U.S.C.A. § 1465 (1984); the second of the pairs charged him with the use of a common carrier for the interstate transportation of the same film or films in violation of 18 U.S.C.A. § 1462 (1984).

A jury convicted him on all counts. After pairing the counts for sentencing, the district court imposed a five year sentence on the conspiracy count and five years on each of the paired transportation counts. Only the first two were to run concurrently while the remainder were to run consecutively, to make a total sentence of twenty-five years. It also imposed fines totaling $35,000.

## II.

The parties have presented this case as if all of the portrayals in the eight named films are bestial. Actually that is not the case. We are informed that in six of the eight films there are portrayals of a variety of sex acts among humans. In one of them, entitled "Snake Fuckers," for example, use of what appears to be a live eel is only one of many incidents. As the film opens, a young woman is shown handling what appears to be a large live eel that she drops on the floor. An older woman appears and the two remove each other's clothing and perform cunnilingus. The younger woman then inserts the eel into the vagina of the older woman. She moves it back and forth. There is a film break, and the eel is then shown inserted in the woman's anus while another object has been inserted in the woman's vagina. The two objects are moved back and forth in their separate orifices.

There is a film break and the two women, now clothed, and a man are shown seated at a kitchen table while frying on the kitchen stove are what appears to be cut up pieces of eel. The man suddenly rises and displays his erect penis. The older woman performs fellatio upon him while the man and younger woman disrobe and touch busy tongues together. The man and the older woman are then shown engaged in vaginal intercourse. The man withdraws in time to spray his ejaculate partly into the open mouth of the woman and partly upon her face and breasts. The woman then licks the head of the penis clean.

Two of the films are exclusively bestial.

In "Horny Boar," a young woman in a short dress teases a boar. The boar persistently seeks to raise the back of her skirt with his snout, though the skirt falls back each time. Finally, the woman removes her dress and panties and assumes a submissive crouching position on the straw covered floor. A second woman throws a rough cloth on the shoulders and upper back of the crouching woman to provide some protection from the boar's pawing hooves. The boar mounts her and she reaches back with her right hand to guide his penis into her vagina. When the boar is finished, the woman climbs over a pile of baled hay and leaves the scene as the boar looks eagerly after her. Later the woman returns. This time with little ado she takes the submissive crouching position. The boar mounts her, and again she reaches back with her right hand to guide his penis. When done, the boar falls off to one side in apparent exhaustion or relaxation.

The other film, "Horsepower," displays two naked women massaging a small pony's penis with their hands and mouths. One woman then positions herself beneath and beside the pony and directs the pony's penis to her genitals. There is little doubt that some touching occurs, but, because of the awkwardness of the position, there is

some doubt about vaginal penetration. A large dog then appears. The women fondle and manipulate his penis. They then have vaginal intercourse with the dog in two different positions.

This is enough, perhaps, to demonstrate Guglielmi's proposition that the films are absolutely disgusting, but it should also demonstrate that there is support for the testimony of the government's expert witness that each of the films would have an appeal to the prurient interest of an otherwise sexually normal person. Some men will find sexual degradation of a woman titillating, while the prurient interest of some males may be aroused by explicit portrayals of a woman's genitals during lesbian activity.

There is a reference in the record by the defendant's "sexologist" to a film showing the insertion of comparatively large objects, a fist and a beer can, into a woman's vagina, though she thought that the film had scientific value in its demonstration of the elasticity of the vagina.

The government's expert also expressed the opinion that the films would appeal to the prurient interest of a deviant sexual group known as zoophiliacs, people who fantasize about sex acts with animals.

### III.

At the trial, there was much bickering between the prosecutor and defense counsel about the prurient interest branch of the *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), test. It was the position of the defense that the prurient interest branch could be satisfied only if the material appealed to the prurient interest of the average person in the sense that the average person viewing the material would experience sexual arousal. The prosecutor thought it enough that the material was "directed to sexual arousal," and the district court formulated the question as being whether the material was an appeal to prurient interest. This, Guglielmi contends, was reversible error since it permitted the jury to find the films obscene without finding that the average person would experience sexual arousal upon seeing them.

One of the defendant's expert witnesses testified that zoophiliacs are not fungible. Their fantasies are animal specific. One whose fantasies are about sexual activity with one animal would not be sexually aroused by portrayals of sexual activity involving any other animal. On the basis of that testimony, Guglielmi contends that there is no such thing as an average zoophiliac, and that the sub-groups are so small no finding of obscenity can be based upon a finding of prurient appeal to zoophiliacs.

### IV.

The test prescribed by *Miller v. California* is "(a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest ...; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct ...; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Miller,* 413 U.S. at 24, 93 S.Ct. at 2615 (quoting *Kois v. Wisconsin,* 408 U.S. 229, 230, 92 S.Ct. 2245, 2246, 33 L.Ed.2d 312 (1972)). The focus here is upon the first branch of the three part test, for there is no doubt that the films here are patently offensive and have no redeeming social value. It bears reminder, however, that material is not obscene unless it is patently offensive.

■ The average person comes into the test not as the object of the appeal but as its judge. It is he, not the most prudish, who, applying contemporary community standards, determines whether or not the work appeals to the prurient interest. There is no explicit requirement that the average person determine that the material appeals to the prurient interest of the average person. If that were the case, the average juror would answer the question by assessing his own reaction.

Doubtless there is an objective component in the test. In *Regina v. Hicklin,* [1868] L.R. 3 Q.B. 316, obscenity was judged by its effect upon the most suscepti-

ble persons. That approach was rejected in *Roth v. United States,* 354 U.S. 476, 488–89, 77 S.Ct. 1304, 1310–11, 1 L.Ed.2d 1498 (1957). Obscenity may not be so lightly found. The effect upon less susceptible persons must be put in the balance. As the offensiveness requirement in the *Miller* test is more than minimally met, however, the greater the number of people who would react to the material with revulsion and disgust. Surely Guglielmi is right that the reaction of most people to these films would be one of rejection and disgust, not one of sexual arousal, but that cannot lead to the conclusion that the most offensive material has constitutional protection while less offensive material does not. In other contexts, one may find many references to the prurient interest of the average person, such as in *Roth*'s rejection of the *Hicklin* test, *id.* at 489–90, 77 S.Ct. at 1311–12, but such references do not convert into a rule that if the material is so offensive as to be more disgusting to the average person than appealing to his prurient interest, it may not be found to be obscene. *See Mishkin v. New York,* 383 U.S. 502, 508–09, 86 S.Ct. 958, 963–64, 16 L.Ed.2d 56 (1966).

Tentative Draft No. 6 of the Model Penal Code, quoted in *Roth,* had it right. In rejecting the tendency to corrupt or debase or arouse lust tests, it defines appeal to the prurient interest as a reference "to qualities of the material itself: the capacity to attract individuals eager for a forbidden look." Model Penal Code § 207.10(2) comments, at 10 (Tent.Draft No. 6, 1957). Those individuals need not all be average persons. *See Pinkus v. United States,* 436 U.S. 293, 301–02, 98 S.Ct. 1808, 1813–14, 56 L.Ed.2d 293 (1978); *Hamling v. United States,* 418 U.S. 87, 128–30, 94 S.Ct. 2887, 2913–14, 41 L.Ed.2d 590 (1974).

Material that provokes "only normal, healthy sexual desires" is not obscene. *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 498, 105 S.Ct. 2794, 2799, 86 L.Ed.2d 394 (1985). It is obscene only if it appeals to or provokes a prurient interest. Such an interest was referred to in *Roth* as a "shameful or morbid interest in nudity, sex or excretion." *Roth,* 354 U.S. at 487 n. 20, 77 S.Ct. at 1310 n. 20 (quoting Model Penal Code § 207.10(2) (Tent.Draft No. 6, 1957)). Many persons, perhaps most persons, having a normal, healthy interest in sex would have no shameful or morbid interest in nudity, sex or excretion. To meet the definition of obscenity, material must appeal to such a shameful or morbid interest and also be patently offensive. The average person would view such materials with an intellectual curiosity, the defendant's expert witnesses agree, but not experience a whetting of sexual appetite. So much may be conceded, but if it appeals to those "individuals eager for a forbidden look," it meets the prurient interest requirement of the *Miller* test.

For these reasons, we reject the defendant's contention that material may not be found to be obscene unless it excites the sexual drive of the average person. The more offensive the material, the greater will be the number who would react to it with revulsion, but, as one commentator has observed, "[N]either the Supreme Court nor the legislature intended that tasteful pornography be suppressed while distasteful pornography remains unregulated." F. Schauer, The Law of Obscenity, 102 (1976).

To the extent that *United States v. Treatman,* 524 F.2d 320 (8th Cir.1975), may be read as supporting the defendant's contention, we are unpersuaded by it. We simply cannot accept the proposition that the First Amendment lends no protection to offensive material but envelops the most offensive within its protective wings.

For the same reasons, the district court was not required to ask the jury to find whether there was such a thing as an average zoophiliac and the appeal of the films to such a person. *See Pinkus,* 436 U.S. at 302, 98 S.Ct. at 1814; *Hamling,* 418 U.S. at 128–29, 94 S.Ct. at 2913–14. The jurors viewed the films, and, with such help as the expert witnesses provided, were competent to make the proper determination.

V.

Before trial, the defendant made a motion for recusal of the judge under 28

U.S.C.A. § 455(a) (West Supp.1987), and now appeals from the denial of that motion.

The motion was based upon remarks made by the judge while imposing a sentence upon a pornographer in an earlier case. The films in that case were particularly vile and repulsive. In imposing sentence, the judge made it clear that he regarded the distribution of such material as a serious offense against society. The judge had been exposed to those films in his judicial capacity, however, and it is entirely appropriate for a judge, when imposing a sentence, to comment upon the nature and gravity of the offense. *See United States v. Carmichael*, 726 F.2d 158, 160 (4th Cir.1984).

This case is wholly unlike *Berger v. United States*, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921). In that case in the World War I era the defendant, who was of German descent, was charged with violations of the Espionage Act. In an earlier case the judge, Kennesaw Mountain Landis, had expressed himself as greatly doubting the loyalty of every German-American. The Supreme Court held, of course, that he should have recused himself in the *Berger* case. The earlier public expression warranted a reasonable belief that the judge was prejudiced against any German-American who might be brought before him upon charges of violations of the Espionage Act. Here, there is nothing to indicate a predisposition on the part of the judge to believe that Guglielmi was guilty of the offenses with which he was charged. A general expression by a judge when sentencing a defendant to a term in prison that the crime of which he stands convicted was a serious one does not disqualify the judge from presiding in later cases involving defendants charged with similar offenses.

## VI.

■ A few days before the trial was to commence, the district judge signed an order that the voir dire of the jurors would be conducted by the judge and the parties would have the right to propose questions to be asked of the jurors. Though the usual practice of most of the district courts in this circuit is to have the judge conduct the voir dire, the usual practice in the Western District of North Carolina is to have the voir dire conducted by the lawyers. The order in this case was said to have been justified by an interest in efficiency to enable the court to reach and dispose of another case.

We see no abuse of discretion by the district court. The defendant has no vested interest in the use of any particular procedure in voir dire. *United States v. Brunty*, 701 F.2d 1375, 1378 (11th Cir.), *cert. denied*, 464 U.S. 848, 104 S.Ct. 155, 78 L.Ed.2d 143 (1983).

■ The defense proposed a large number of questions, and the district judge used most, but not all, of them. He did not inquire of the jurors about their personal attitudes toward specified sexual practices.

We find nothing inherently unfair in the voir dire. The jurors were asked a great many questions designed to disclose their associations and general attitudes. The declination by the district judge to ask the jurors about their personal reactions to specified sex acts was well within the court's discretion. *See Hamling*, 418 U.S. at 138–40, 94 S.Ct. at 2917–18; *see also United States v. Martin*, 773 F.2d 579, 584 (4th Cir.1985).

## VII.

■ Finally, the defendant complains about the twenty-five year sentence imposed upon him. He seeks to have this court conduct a proportionality analysis of it and find that it is so disproportionate as to amount to cruel and unusual punishment in violation of the Eighth Amendment.

This panel is concerned about the sentence. The sentence is within the statutory limits, but the judge ordered that the sentences on the five paired counts run consecutively. Those counts were based upon separate shipments of the offensive films, and some of those shipments were instigated by the FBI. An even greater number of offenses might have been charged had the FBI not discontinued its ordering of new films when it did.

Guglielmi had been in the business for a number of years, but he had never been convicted of any offense.

A panel of this court has recently held, however, that *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), does not require a proportionality review of any sentence less than life imprisonment without possibility of parole. *United States v. Rhodes,* 779 F.2d 1019 (4th Cir.1985), *cert. denied,* ─ U.S. ──, 106 S.Ct. 2916, 91 L.Ed.2d 945 (1986). This panel has no authority to overturn *Rhodes* or to depart from its holding. Only the *en banc* court may do that.

### VIII.

Finding no error, the conviction is affirmed, and we decline to review the sentence.

AFFIRMED.