**Jim ST. JOHN, Curtis Rene Peterson and Cinema Blue of Charlotte, Inc., Petitioners,**

v.

**STATE OF NORTH CAROLINA PAROLE COMMISSION, Louis Columbo, Chairman and John Patseavouras, Director of the State of North Carolina Parole Commission, Respondents.**

No. C–C–90–286–P.

United States District Court,
W.D. North Carolina,
Charlotte Division.

May 2, 1991.

Nelson Casstevens, Casstevens Hanner Gunter & Gordon, Harold Bender, Charlotte, N.C., Lee J. Klein, Bradley J. Shafer, Klein & Shafer, P.C., Okemos, Mich., for petitioners.

Richard N. League, Sp. Deputy Atty. Gen., Raleigh, N.C., for respondents.

## MEMORANDUM OF DECISION AND ORDER

ROBERT D. POTTER, District Judge.

THIS MATTER is before the Court on Respondents' motions, filed October 22, 1990, for summary judgment. The motions are in response to a petition filed by Petitioners on August 31, 1990 in which Petitioners St. John and Peterson seek relief from incarceration under 28 U.S.C. § 2254, and Petitioner Cinema Blue seeks relief from paying a fine under 42 U.S.C. § 1983.

On March 4, 1991, Respondents filed amended motions for summary judgment. Petitioners, on March 7, 1991 and March 19, 1991, filed responses to the motions for summary judgment. On April 18, 1991, Petitioners filed an amended petition naming as Respondents those state officials currently maintaining custody over Petitioners.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

Petitioners were indicted in 1988 by the Mecklenburg County, North Carolina Grand Jury on various counts of disseminating obscene materials in violation of N.C.Gen.Stat. § 14–190.1. Cinema Blue was an adult bookstore and theater located in Mecklenburg County. Although the record is not entirely clear, it appears that Petitioners St. John and Peterson were the owners/operators of Cinema Blue. The indictments charged Petitioners with selling six (6) obscene videotapes and one (1) obscene magazine in 1988. Prior to trial, the State dismissed the indictment as to three (3) of the videotapes.

In February, 1989, the Honorable Marvin Gray presided over the trial involving the remaining three (3) videotapes and the single magazine.[1] The videotapes were shown to the jury as was the magazine. The principal evidence offered by Petitioners was the voir dire, proffered testimony of five (5) expert witnesses and documents derived from studies conducted by these experts. The studies included a random telephone survey of 407 adults from Mecklenburg County, a film evaluation study by 129 adults of the six (6) videotapes and the magazine listed in the indictment, a telephone study of 200 Cinema Blue customers, and a study of materials comparable to those at issue in the indictment. The expert witnesses testified that their studies indicated pursuant to the contemporary community standard of Mecklenburg County, the materials at issue would not appeal to a prurient interest and would not be

---

1. The lurid titles of the videotapes were "Video Games, Vol. X, Cum and Cum Again", "the Big Switch", and "Cum Shot Review, Vol. Four". The magazine contained an equally repulsive title—"Pregnant and Sexy". It does not take a great deal of imagination to ascertain the content of these materials.

406

patently offensive to the average person in the community.

After hearing the voir dire testimony, Judge Gray excluded all of the expert testimony, the documents from the studies, and the expert conclusions derived from the studies. Thereafter, the jury found the videotapes "Video Games Vol. X, Cum and Cum Again III" and "Cum Shot Review, Vol. Four" obscene. The jury failed to find the remaining videotape "the Big Switch" and the magazine to be obscene. Accordingly, the jury returned guilty verdicts against Petitioners. Judge Gray imposed terms of imprisonment of six (6) years each on Petitioners St. John and Peterson, and imposed a $150,000.00 fine on Petitioner Cinema Blue.

Petitioners appealed to the North Carolina Court of Appeals. On June 5, 1990, that court affirmed the convictions and finding that the two (2) videotapes were obscene. The North Carolina Supreme Court entered a temporary stay of execution of sentence on June 27, 1990. On July 26, 1990, the North Carolina Supreme Court dissolved the stay and denied Petitioners' Petition for Discretionary Review. The court, on August 20, 1990, denied Petitioners' motion for reconsideration.

■ This action was filed on August 31, 1990 and assigned to the undersigned.[2] On September 26, 1990, Petitioners filed a motion to stay the execution of sentence. The Court on October 1, 1990 denied Petitioners' motion. The Court is informed that thereafter Petitioners were taken into custody by the appropriate North Carolina officials. On January 23, 1991, the Court

entered an Order staying this matter while Petitioners' writ of certiorari was pending before the United States Supreme Court.

■ The Court dissolved that stay on March 6, 1991 after learning that the Supreme Court had denied certiorari on February 19, 1991. On March 26, 1991, the Court granted Petitioners' motion to amend the petition in order to substitute the parties presently having custody of Petitioners as Respondents. On April 18, 1991, Petitioners filed the amended petition substituting as Respondents the appropriate North Carolina Parole Commission officials since Petitioners have been recently paroled. Because the amended petition is identical to the original petition and because the interests of the current Respondents are identical to that of the former Respondents, the Court does not believe it is necessary for Respondents to respond to the amended petition. Rather, the Court will treat the previously filed materials of the former Respondents as having been filed for the current Respondents.

Having given the parties ample time to brief the numerous issues presented in the Petition, the Court now believes that this matter is ripe for disposition. The Court for the reasons enunciated below finds that Petitioners' federal constitutional rights were not violated during the trial of this matter, and that Respondents motion for summary judgment should be granted.

II. APPLICABLE LEGAL STANDARD FOR SUMMARY JUDGMENT.

Summary judgment is appropriate when the pleadings, responses to discovery, and

**2.** Although the issue has not been directly raised, it is apparent from the Petition that Petitioners assumed this matter would be assigned to the Honorable James B. McMillan. Judge McMillan presided over a motion for an injunction enjoining the Mecklenburg County District Attorney from prosecuting Petitioners' experts for disseminating obscenity during the completion of the studies. *See Cinema Blue of Charlotte v. Gilchrist,* 704 F.Supp. 631 (W.D.N.C. 1989). Judge McMillan entered the injunction. The Fourth Circuit several weeks later, however, reversed Judge McMillan on *Younger* abstention grounds. *See Cinema Blue of Charlotte v. Gilchrist,* 887 F.2d 49 (4th Cir.1989).

The issues involved in the previous action were completely different than the issues cur-

rently before this Court in the pending habeas case. Accordingly, the Clerk was correct in utilizing the random selection process which resulted in this matter being assigned to a different judge. Furthermore, the previous case was closed out and was not pending when this action was filed.

Throughout the Petition and various other pleadings, Petitioners refer to Judge McMillan's previous order and imply that this Court is bound to those findings. This Court is not bound by rulings that the undersigned was not a party to, and and more important, the Fourth Circuit explicitly reversed Judge McMillan. The implication that the undersigned is bound by a ruling that was found by the Court of Appeals to be legally erroneous is ludicrous.

the record reveal that no genuine issue of any material fact exists and that the moving party is entitled to judgment as a matter of law. *See* Rule 56(c) of the Federal Rules of Civil Procedure. The party moving for summary judgment has the initial burden of showing that no genuine issue of any material fact exists and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). After the moving party has met its burden, the non-moving party must come forward with specific facts showing that evidence exists to support its claims and that a genuine issue for trial exists. *Id.; Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see* F.R.Civ.P. 56(e) (in response to motion for summary judgment, "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial"). When considering motions for summary judgment, courts must view facts and inferences from the facts in light most favorable to the party opposing the motion for summary judgment. *Matsushita*, 475 U.S. at 587–88, 106 S.Ct. at 1356–57; *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). When, however, the evidence from the entire record could not lead a rational factfinder to find for the non-moving party, no genuine issue for trial exists and summary judgment is appropriate. *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356.

In this case, only legal issues are presented to the Court concerning the constitutionality of Petitioners' convictions. Thus, no issues of material fact are in dispute and summary judgment is appropriate. The Court has reviewed the entire record in this matter including the case file, the voluminous transcripts from the trial, relevant exhibits from the trial, and the applicable law.[3] The Court's discussion follows.

## III. DISCUSSION.

■ A petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 is the procedure utilized to challenge on federal constitutional grounds a state conviction. *See Postconviction Relief and Prisoners' Civil Rights Law in the Fourth Circuit*, at 1 (1991) (hereinafter "Postconviction Relief"). The Petitioner must show a substantial constitutional deprivation in order to prevail on the habeas petition, and the Petitioner carries the burden of proof. *See Clayton v. Haynes*, 517 F.2d 577 (4th Cir.1975).

■ In order to maintain standing in a § 2254 action, the Petitioner must raise a cognizable claim—one that alleges violations of the federal Constitution, laws or treaties. *See Rose v. Hodges*, 423 U.S. 19, 96 S.Ct. 175, 46 L.Ed.2d 162 (1975). Moreover, the Petitioner must be in state custody. *See Jones v. Cunningham*, 371 U.S. 236, 240, 83 S.Ct. 373, 375–76, 9 L.Ed.2d 285 (1963). The Petitioner must also raise a "live case or controversy"—one that is not moot. *See Leonard v. Hammond*, 804 F.2d 838 (4th Cir.1986). Additionally, the Petitioner must have exhausted all state remedies. *See Preiser v. Rodriguez*, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). The Petitioner is further required to have complied with state procedural rules which would provide adequate and independent grounds for state relief. *See Harris v. Reed*, 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). Finally, the Petitioner must demonstrate that the petition is not prejudicially delayed or successive. *See Sanders v. United States*, 373

---

**3.** No issue concerning the obscenity of the videotapes has been raised by Petitioners. Rather, Petitioners contend primarily that the trial court impermissibly denied them of the opportunity to present a defense. Other issues raised by Petitioners include the failure of the prosecution to prove scienter, improper jury instructions, the improper introduction of one of the Petitioners' statements, and the introduction of prior convictions. None of these issues address whether the videotapes were obscene materials under the First Amendment. Accordingly, the Court does not believe that it was necessary for it to review the videotapes.

U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963); *Johnson v. Riddle*, 562 F.2d 312 (4th Cir. 1977).

In this case, Respondents have not raised any serious contentions that Petitioners have failed to meet their initial burden of standing as enunciated above.[4] The basis of Respondents' motion for summary judgment is that Petitioners have failed to carry their burden of demonstrating that a substantial constitutional deprivation was committed by the trial court.

Petitioners believe the following arguments support their contention that relief is available:

(A) The trial court excluded Petitioners' expert evidence in violation of Petitioners' right of confrontation and compulsory process pursuant to the Sixth Amendment and their due process rights pursuant to the Fourteenth Amendment;

(B) The convictions violate the First Amendment because no evidence was presented by Respondents to establish scienter;

(C) Petitioners were convicted in violation of their First Amendment Rights in having one of the films at issue judged by the wrong reference group;

(D) Testimony by Government witnesses of guilty pleas and convictions was improperly introduced;

(E) Hearsay statements of Petitioner Peterson were improperly introduced; and

(F) Several jury instructions were violative of constitutional protections.

The Court will discuss each argument below.

### A. *THE EXCLUSION OF EXPERT TESTIMONY.*

As previously noted, Petitioners at trial proffered the testimony of five (5) expert witnesses concerning studies conducted by the experts. Not surprisingly, those studies led Petitioners' experts to conclude that pursuant to the contemporary community standard of Mecklenburg County, the materials at issue would not appeal to a prurient interest and would not be patently offensive to the average person in the community; that is, the materials were not obscene.[5]

After hearing the testimony of the experts and examining the results of the studies, Judge Gray found that the issues addressed by the studies ultimately concerned issues that had to be resolved by the jury. Judge Gray indicated he did not believe that the results of the studies and the testimony of the experts would be of assistance to the jury and might even result in jury confusion if introduced. Therefore, Judge Gray excluded the evidence pursuant to Rule 702 of the North Carolina Evidence Code (codified at N.C.Gen.Stat.

---

**4.** In its amended motion for summary judgment filed March 4, 1991, Respondents have raised several procedural defenses regarding the claim under 42 U.S.C. § 1983. Although not entirely clear from the petition, it appears that the § 1983 claim is limited to Petitioner Cinema Blue. However, Respondents state that the defenses apply to all Petitioners. Furthermore, those defenses may overlap with the habeas claims.

The Court has reviewed the defenses raised by Respondents. The Court believes those defenses are inapplicable to the habeas action. As to the applicability of defenses to the § 1983 action, the Court believes (as discussed *infra.*) that Petitioners have failed to demonstrate a constitutional deprivation occurred at the trial of this matter. Therefore, the § 1983 action cannot proceed. Accordingly, the Court does not be-

lieve it necessary to address the defenses raised by Respondents.

**5.** The United States Supreme Court has developed a tripartite test in examining whether pornographic materials can be deemed unlawfully obscene under a state law. *See Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973). "[T]he basic guidelines for the trier of fact must be: (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value". *Id.* (citations omitted). In this case, only the first and second prongs of the test are at issue.

§ 8C–1). *See Trial Transcript* at 874 (hereinafter "TT"). As an alternative position, Judge Gray found that any probative value of the proffered expert testimony was substantially outweighed by the danger of confusion to the jury and should be excluded under Rule 403 of the North Carolina Evidence Code.

■ The United States Supreme Court has consistently held that expert testimony in an obscenity prosecution is not necessary if the materials at issue are introduced. *See Pinkus v. United States,* 436 U.S. 293, 302, 98 S.Ct. 1808, 56 L.Ed.2d 293 (1978) ("[W]hether materials are obscene generally can be decided by viewing them; expert testimony is not necessary"); *Hamling v. United States,* 418 U.S. 87, 100, 94 S.Ct. 2887, 2899, 41 L.Ed.2d 590 (1974) ("[E]xpert testimony is not necessary to enable the jury to judge the obscenity of material which, as here, has been placed into evidence"); *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 56, 93 S.Ct. 2628, 2634–35, 37 L.Ed.2d 446 (1973) ("[I]n the cases in which this Court has decided obscenity questions since *Roth,* it has regarded the materials as sufficient in themselves for the determination of the question. *Ginzburg v. United States,* 383 U.S. 463, 465, 86 S.Ct. 942, 944, 16 L.Ed.2d 31 (1966)"). The Supreme Court has made it abundantly clear that the United States Constitution does not dictate that expert testimony be introduced in an obscenity case. *See Kaplan v. California,* 413 U.S. 115, 122, 93 S.Ct. 2680, 2685, 37 L.Ed.2d 492 (1973) (holding that prosecutor's evidence without introduction of expert testimony was "[s]ufficient as a matter of federal constitutional law to support petitioner's conviction"). The defense should be free to introduce expert testimony only if the materials are appropriate; in other words relevant and helpful to the jury. *Id.*[6]

The rationale for the well-established rule that expert testimony need not be introduced in an obscenity case is grounded in common sense. The films are the best evidence of what they represent. *See Paris Adult Theatre I,* 413 U.S. at 56, 93 S.Ct. at 2634–35. Moreover, obscenity is not a subject that lends itself to the traditional use of expert testimony. *Id.* at 56, note 6, 93 S.Ct. at 2634, note 6. Expert testimony is usually admitted to assist lay jurors in understanding what they otherwise could not. *Id.* The uses of such testimony employed in obscenity cases "[h]ave often made a mockery out of the otherwise sound concept of expert testimony". *Id.* As one court has so succinctly noted, "[S]imply stated, hard core pornography . . . can and does speak for itself". *Id.* (citing *United States v. Wild,* 422 F.2d 34, 36 (2d Cir. 1970), *cert. denied,* 402 U.S. 986, 91 S.Ct. 1644, 29 L.Ed.2d 152 (1971)).

Courts have extended the rule that expert testimony in obscenity cases is not constitutionally mandated to habeas actions. One court refused to find that a state court trial was conducted in an unconstitutional manner when the trial judge gave the following jury instruction:

---

**6.** Petitioners have attempted to avoid the clear import of these line of cases by arguing that those cases involved an argument by a petitioner that the Government had failed to prove its case by not introducing expert evidence attesting to the obscenity of the charged materials. Petitioners have brought to the Court's attention an Ohio Court of Appeals case that held that the aforementioned line of cases are limited to only those situations where the prosecution fails to introduce expert testimony and not the situation where a defendant attempts to introduce such testimony. *See State v. Barton,* 45 Ohio App.2d 249, 344 N.E.2d 342 (1975).

The Court has reviewed that decision. In as much that the decision is not binding precedent, the Court chooses to disregard it. Moreover, the Court finds the rationale of the decision flawed. In *Kaplan v. California,* 413 U.S. 115, 121, 93 S.Ct. 2680, 2685, 37 L.Ed.2d 492 (1973), the Supreme Court stated, "[W]e also rejected in *Paris Adult Theatre I* any constitutional need for 'expert' testimony on behalf of the prosecution, *or for any other ancillary evidence of obscenity,* once the allegedly obscene material itself is placed in evidence". (emphasis added and citations omitted). *See also United States v. Pryba,* 900 F.2d 748, 757 (4th Cir.) (holding that *Paris Adult Theatre I* case was applicable to situation where district court excluded defense expert testimony), *cert. denied,* —— U.S. ——, 111 S.Ct. 305, 112 L.Ed.2d 258 (1990). It is evident to this Court that the Supreme Court has not limited the aforementioned line of cases to the situation where the prosecution fails to introduce expert testimony.

In the trial of a pornography case, neither the prosecution *nor the defense* shall be required to produce expert testimony as to whether the material or performance is or is not harmful to adults, or is not pornographic, or as to any element of the definition of pornographic, including contemporary community standards (emphasis added).

See *Piepenburg v. Cutler*, 649 F.2d 783, 793 (10th Cir.1981). The court in *Piepenburg*, in applying the Supreme Court test in an action brought pursuant to § 2254, noted, "[w]hen the material itself is introduced into evidence, the jury may judge for itself, using its own sense of community standards, whether the material is obscene; that is, the jury brings to the trial the community standard and no evidence is necessary to establish it". *See id.* at 792; *see also Avery v. Maryland*, 515 F.Supp. 818, 823 (D.Md.1980) ("[T]he presentation of expert testimony by the prosecution is neither mandated nor likely to be helpful to the jury in the routine obscenity case ... (and the) failure to provide such testimony is not a basis for habeas corpus relief"), *aff'd* 661 F.2d 917 (4th Cir.), *cert. denied*, 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981).

The Fourth Circuit has recently addressed the question of whether the exclusion of defense expert testimony in an obscenity case was an error of constitutional dimension. In *United States v. Pryba*, 900 F.2d 748, 757 (4th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 305, 112 L.Ed.2d 258 (1990), the court reiterated the Supreme Court rule that the jury needs "[n]o assistance from experts on the issue of obscenity once the challenged materials are in evidence". The court upheld the decision of the district court judge in finding that a study conducted by an expert was inaccurate and would not assist the jury. *Id.; see also United States v. Bamman*, 737 F.2d 413 (4th Cir.1984), *cert. denied*, 469 U.S. 1110, 105 S.Ct. 789, 83 L.Ed.2d 783 (1985) (admission of expert testimony is in sound discretion of trial court and may be excluded when speculative).

The Court will address below each of the surveys conducted by Petitioners' experts and whether the exclusion of those surveys constituted a substantial constitutional deprivation.

### 1. *Telephone Surveys.*

In reviewing the record from this case, the Court cannot conclude that Judge Gray abused his discretion in excluding the expert testimony regarding the two (2) telephone surveys. In reviewing a similar opinion poll, the district court in *Pryba* found that the opinion poll was not relevant to whether the charged materials were obscene, and even if relevant, its probative value was exceeded by the unfair prejudicial effect the poll would have. *See United States v. Pryba*, 678 F.Supp. 1225, 1228 (E.D.Va.1988), *aff'd* 900 F.2d 748 (4th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 305, 112 L.Ed.2d 258 (1990).

The district court was concerned in particular that the survey questions did not convey the impact of the visual image of the materials.[7] Similarly in this case, the survey questions from the random telephone survey questions were inadequate to convey the impact of the visual image of the materials.[8] The Court believes that the

---

7. The survey described the nudity and sex shown in the materials in the following manner: "nude bodies and close-up, graphic depictions of a variety of sexual activities, including: sexual intercourse, ejaculation, bondage, oral sex, anal sex, group sex and variations of these by adult performers". *Pryba*, 678 F.Supp. at 1228. The district court noted that the term "bondage" did not adequately describe the activities actually depicted in the films such as women's breasts and men's genitals being placed in tourniquet devices. *Id.* at 1229.

8. Only three of the questions directly dealt with adult oriented materials. Those questions included:

18. Do you think it is or is not tolerated in your community for the average adult to obtain and see adult movies, video cassettes and magazines showing such nudity and sex if they should want to?

19. Do you believe you should or should not be able to see any showing of actual sex acts in adult movies, video cassettes, or magazines if you should want to?

20. Some adult movies, video cassettes and magazines show actual sex acts in great detail

trial court was correct in finding that the probative value of the survey was substantially outweighed by the danger of confusion to the jury. Accordingly, Petitioners have not suffered a substantial constitutional deprivation regarding the exclusion of this survey and any relevant testimony concerning it.[9]

■ As to the second telephone survey involving customers of Petitioner Cinema Blue, the Court finds the assertion that such a survey was designed to accurately reflect the community values analogous to asking the fox to guard the hen house. Common sense would lead any honest person to conclude that a customer of an adult book store is not going to reflect the values of the average person of the community. The court in *Pryba*, in response to a similar survey involving the same supposed expert as in this case, stated:

Dr. Scott's (survey), in essence, constitutes nothing more than a one-man, eight-day, unscientific poll of purveyors and purchasers of smut. To permit this so-called 'study' to masquerade as expert testimony on Northern Virginia's con-

temporary community standards of obscenity is ludicrous.

*Pryba*, 678 F.Supp. at 1234. The Court concurs with that assessment as applied to the study at issue here, and finds that the trial court did not abuse its discretion in excluding the survey. Thus, it cannot be said that the exclusion constituted a constitutional deprivation of Petitioners' rights.

### 2. *Comparison Evidence.*

■ Petitioners offered the proffered testimony of one of their experts regarding a study of 100 sexually explicit videotapes that had been rented by customers of Cinema Blue. The videotapes were rented during a seven (7) month period on over 5,000 occasions, but not necessarily to 5,000 different individuals. The expert testified that the videotapes, which allegedly contained content similar to the videotapes charged in the indictment, were supposedly rented by a wide cross section of adults in Mecklenburg County. *See* TT at 802–03.[10] On cross-examination of the expert, however, the expert admitted that he was unable to determine whether some of the videotapes had been repetitiously rented by the same customers. *Id.* at 810. More-

and with close-ups of the sexual organs. Would viewing this type of material appeal to your unhealthy, shameful or morbid interest in sex?
*See Defendant's Exhibit #9 from Trial; Final Report of the Mecklenburg County North Carolina Film Evaluation Project,* at 79–80.
Just as in *Pryba*, these sterile and innocuous questions do not begin to describe the graphic and lurid depictions of sexual activities contained in the videotapes at issue in this case. Moreover, the Court notes that the questions can hardly be described as objective. The "correct" answers are clearly suggested by the form of the questions. The Court can only wonder what results might have occurred if the questions would have accurately conveyed the graphic depictions contained in the videotapes.

9. The Court recognizes that "[p]roperly conducted public opinion surveys may be useful (and thus admissable) in gauging community standards for the purposes of determining whether the materials at issue are obscene". *Pryba*, 678 F.Supp. at 1229. However, the Court rejects Petitioners' contention that the introduction of such surveys at trial is constitutionally mandated. Petitioners have failed to demonstrate that Judge Gray abused the great amount of discretion given to him in excluding the expert testimony. The Court further notes that the burden

of demonstrating a constitutional deprivation is on Petitioners, and that Petitioners have failed to meet the burden placed upon them in sustaining an action brought pursuant to 28 U.S.C. § 2254.

10. The expert examined lists supplied by Petitioners containing the title of the videotapes and the number of times each videotape had been rented over the seven (7) month period. The list, however, did not contain the name of the individuals renting the videotapes. Thus, the expert was unable to determine whether the same customers were renting different videotapes each week or month. Despite this obvious deficiency in the methodology of the study, the expert nonetheless concluded that the videotapes were rented by a large cross-section of the community. The expert concluded that since the videotapes had been rented on over 5,000 occasions, that 2% of the population of Mecklenburg County had rented the videotapes. As previously discussed, however, this conclusion is seriously flawed in light of the expert's failure to factor into his analysis repeat renters. In any event, it is evident that 2% of the population of Mecklenburg County did not view these videotapes.

over, the expert was unable to document whether the videotapes had been rented only by persons residing in Mecklenburg County. *Id.* at 811.

Even if there were no repeat renters of the videotapes and each of the renters resided in Mecklenburg County (which is highly unlikely as discussed *supra.*), the total films reviewed by Petitioners' expert only accounts for 2% of the population of Mecklenburg County—hardly a showing that the "comparable materials" possess a reasonable degree of community acceptance. *See Womack v. United States,* 294 F.2d 204, 216 (D.C.Cir.), *cert. denied,* 365 U.S. 859, 81 S.Ct. 826, 5 L.Ed.2d 822 (1961). Moreover, as previously stated, the Court does not believe that the customers of Cinema Blue are an accurate gauge of the values held by the average community member. Based on the testimony presented to the trial court, the Court does not believe that it was erroneous for Judge Gray to conclude that this evidence was unreliable or unhelpful to the jury. The Court does not believe that Petitioners have demonstrated that they suffered a constitutional deprivation by this study being excluded.

### 3. *Film Evaluation Study.*

■■■ In addition to the other studies, Petitioners attempted to introduce at trial a study involving focus groups that reviewed the films named in the indictment. According to Petitioners, the admission of such a study has never been attempted at an obscenity trial. *See Petitioners' Brief of August 31, 1990,* at 18. Because the materials presented in the study were the films actually at issue, Petitioners argue that the trial court had no basis in law to exclude these studies.

Admittedly, the procedures utilized in the film evaluation study were designed to lead to the introduction of more relevant evidence than the other studies. Nonetheless, the Court does not believe that this fact

alone requires the admission of the study. The proffered expert testimony revealed that only 20 to 24 people viewed each of the videotapes at issue.[11] Given the fact that the study was conducted in conditions exclusively in the control of Petitioners, the Court does not believe that Judge Gray was in error in finding that this evidence would be of no assistance to the 12 members of the community comprising the jury. Simply put, the Court believes that the record in this matter raises serious questions regarding whether those selected to participate in the study were "average" members of the community. The Court can envision large numbers of the community refusing to participate in a study that would expose them to the filth contained in the films at issue here. Even if it could be demonstrated that the focus groups were comprised of "average" citizens, the Court doubts whether the opinion of 20 to 24 persons would be of great assistance to the jury in deciding what in effect is a jury question—whether the films were obscene. Thus, the Court believes that the trial court did not deprive Petitioners of any constitutional right in excluding this study.

### B. *WHETHER SCIENTER WAS ESTABLISHED.*

■■■ Petitioners argue that Respondents failed at trial to introduce any evidence demonstrating that Petitioners were aware of the contents of the materials at issue. Apparently, Petitioners St. John and Peterson were out-of-town owners/operators of Cinema Blue instead of clerks. Petitioners contend that the scienter requirement necessary to sustain a conviction for disseminating obscenity requires that evidence be introduced at trial showing that the defendants were aware of the contents of the charged materials. *See Hamling,* 418 U.S. at 121, 94 S.Ct. at 2909–10. Thus, Petitioners argue that their First Amendment rights have been violated.

---

**11.** Petitioners argue that the Court should not consider the small composition of the focus groups because the district attorney threatened to prosecute the experts for disseminating obscenity if the films were shown to the focus groups. As previously noted, Judge McMillan entered an order enjoining the district attorney from prosecuting the experts. However, the Fourth Circuit vacated that order as being unlawful. The Court does not believe that Petitioners can complain of the size of the focus groups in light of the Fourth Circuits' opinion.

While it is true Respondents failed at trial to introduce any *direct* evidence that Petitioners were aware of the contents of the charged materials, the Supreme Court in *Hamling* did not rule that only *direct* evidence can establish the scienter element necessary to sustain an obscenity conviction. Rather, the Supreme Court stated:

It is constitutionally sufficient that the prosecution show that a defendant had knowledge of the contents of the materials he distributed, and that he knew the character and nature of the materials. To require proof of a defendant's knowledge of the legal status of the materials would permit the defendant to avoid prosecution by simply claiming he had not brushed up on the law.

*Id.* at 123, 94 S.Ct. at 2910–11. The Supreme Court has also found that knowingly distributing obscene materials can be defined as "knowledge" of, or "reason to know". *Id.* (citing *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968)).

In this case, Respondents introduced a plethora of circumstantial evidence indicating that Petitioners had a sufficient knowledge of the content of materials at issue. *See Respondents' Brief of October 22, 1990*, at 10; *see also* TT at 331–12, 448–50, 561, 575, 142–45, 149, 159–60, 178, 182, 187, 209–13, 223, 522, 245–46, 144, 178–79, 430–31 and 151. It was up to the jury to determine whether Petitioners had the requisite scienter to commit the crime charged. Obviously, from the circumstantial evidence presented at trial, the jury found that Respondents established the scienter element beyond a reasonable doubt. Therefore, the Court does not believe Petitioners have suffered a constitutional deprivation regarding this issue.

C. *WHETHER THE WRONG REFERENCE GROUP WAS UTILIZED IN REFERENCE TO THE VIDEOTAPE DEPICTING HOMOSEXUAL ACTS.*

■ One of the videotapes the jury found to be obscene, "Video Games Vol. X, Cum and Cum Again, III", depicted exclusively homosexual activity. Petitioners argue that the trial court erred in failing to instruct the jury to judge the videotape by the average member of the homosexual community, rather than the average member of the community.

Petitioners rely on the United States Supreme Court case of *Mishkin v. New York*, 383 U.S. 502, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966). In that case, the Court held that when material is not designed to appeal to the prurient interest of the average member of society, but is instead designed to appeal to the prurient interest of a deviant member of society, the trial court may instruct the jury to consider whether the prurient interest of the material appeals to a member of the deviant group. *Id.* at 509, 86 S.Ct. at 963–64. Such an option is meant to foreclose the possibility of a defense that the material at issue when considered by the average member of the community, "[i]nstead of stimulating the erotic, disgust(s) and sicken(s)". *Id.* at 508, 86 S.Ct. at 963.

■ Petitioners' argument that *Mishkin* requires an instruction that particularly repulsive and offensive sexually explicit material be judged only by deviant members of the community reeks with the putrid stench of frivolity. It is evident from the decision in *Mishkin* that the Supreme Court was attempting to "adjust the prurient-appeal requirement to social realities". That is, some pornography is not designed to appeal to the prurient interest of the average member of the community. *Id.* at 509, 86 S.Ct. at 963–64. In order for the standard *Miller* test of obscenity to apply to this type of pornography, adjustments had to be made to the test. However, the Supreme Court has at no time indicated that this test was meant to require the Government to carry a heavier burden in proving materials obscene that are designed for use exclusively by deviant groups. *Id.; see also United States v. Guglielmi*, 819 F.2d 451, 455 (4th Cir.1987) ("[t]he district court was not required to ask the jury to find whether there was such a thing as an average zoophiliac and the appeal of the films to such a person"),

*cert. denied,* 484 U.S. 1019, 108 S.Ct. 731, 98 L.Ed.2d 679 (1988).[12] If anything, *Mishkin* makes such prosecutions easier.

For these reasons, the Court concludes that the trial court did not err in failing to give the instruction urged by Petitioners.

### D. *TESTIMONY BY WITNESSES OF GUILTY PLEAS AND CONVICTIONS.*

■ Two (2) ex-employees of Petitioners testified on behalf of Respondents at trial that they had been convicted of, or pleaded guilty to, obscenity counts in 1985. Another former employee testified that he had pleaded guilty to conspiracy to disseminate obscenity in the years of 1985 through 1988. Petitioners, without citing any law in support, contend that the introduction of this information somehow violated their due process rights.

The argument is completely nonsensical. It appears from the record that the information was introduced in order to place the testimony in context. Moreover, the tactical move of a party impeaching its own witness in order to limit the damage of that testimony on cross-examination is well established. *See Clanton v. Bair,* 826 F.2d 1354, 1359 (4th Cir.1987), *cert. denied,* 484 U.S. 1036, 108 S.Ct. 762, 98 L.Ed.2d 779 (1988).

The Court can think of numerous other reasons why this information was relevant and admissible. Because Petitioners have failed to make an argument that is even slightly plausible, the Court will not spend any more time addressing this issue. The Court rejects the argument that Petitioners suffered a constitutional deprivation when the trial court allowed the witnesses to testify regarding convictions and guilty pleas.

### E. *HEARSAY STATEMENTS.*

■ One of Petitioners' ex-employees testified at trial that Petitioner Peterson told him that Peterson was no longer his boss, and that he would have to take up any job related problems with Petitioner St. John. Petitioner St. John contends that this hearsay testimony violated his constitutional rights to confront Respondents' witness since Petitioner Peterson did not take the stand. *See Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

The Court finds this argument to be as frivolous as the last argument. A *Bruton* violation does not occur if the jury had an adequate basis on which to evaluate the truth or falsity of the statement despite the lack of an opportunity to cross-examine. *See California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). In this case, the fact that Petitioner St. John at some point in time assumed the managerial responsibilities from Petitioner Peterson was established by other, non-objected to testimony. *See* TT at 352. Accordingly, the admission of the testimony was harmless error even if the testimony violated *Bruton.*

For the reasons cited above, the Court cannot conclude that the admission of this testimony constituted a substantial constitutional deprivation.

### F. *JURY INSTRUCTIONS.*

Petitioners argue that the trial court improperly refused to give various jury instructions suggested by them. The Court

---

**12.** Petitioners argue that the trial court can instruct the jury to judge the materials with regard to the average member of the community if and only if the materials are designed to appeal to both the average member of the community and a member of the deviant group. But where the materials are designed only to appeal to the prurient interest of a member of a deviant group, Petitioners contend that the materials must be judged only in regards to an average member of the deviant group.

The Fourth Circuit in *Guglielmi* rejected such an argument. In that case, two (2) of the eight (8) films depicted exclusively bestiality material. *See Guglielmi,* 819 F.2d at 453. The court went on to find that the trial court did not abuse its discretion in instructing the jury to consider the films with regard to an average member of the community.

Such an analysis is based on common sense. "[W]e reject the notion that greatly offensive material has the protection of the First Amendment while less offensive material does not". *Id.* at 452.

has reviewed each of these instructions and believes that the trial court used good judgment and insight in refusing to give these instructions. The Court believes that the instructions would not have helped the jury in its deliberations. Accordingly, Petitioners did not suffer a substantial constitutional deprivation regarding this issue.

## IV. CONCLUSION.

As discussed above, the Court believes that Petitioners have failed to demonstrate that they suffered a substantial constitutional deprivation on any of the issues presented. Therefore, summary judgment in favor of Respondents is appropriate.

## V. ORDER OF THE COURT.

NOW, THEREFORE, IT IS ORDERED that Respondents' motion for summary judgment be, and hereby is, GRANTED.

### *JUDGMENT*

In accordance with the Memorandum of Decision and Order entered simultaneously with this Judgment,

IT IS ORDERED, ADJUDGED AND DECREED that:

(1) Respondents' motion for summary judgment is GRANTED;

(2) Petitioners' have and recover NOTHING in this action;

(3) This action be DISMISSED WITH PREJUDICE; and

(4) Each party shall pay their own costs.